# ARCHDIOCESE OF PORTLAND IN OREGON *v.* DEPARTMENT OF REVENUE

Eugene E. Feltz, Casey, Palmer & Feltz, Portland, represented plaintiff.

Walter J. Apley, Assistant Attorney General, Salem, represented defendant.

Decision for plaintiff rendered September 29, 1972.

HALL S. LUSK, Judge Pro Tempore.

Plaintiff, Archdiocese of Portland in Oregon, a corporation, appeals from an order of defendant, Department of Revenue, denying its claim of exemption from taxation for the 1970 assessment year of certain real property described as Tax Lot 1, Block 1, General Anderson's Addition to the City of Portland, and Lots 1 and 2, Block 1, Mannings Addition to the City of Portland, except the north 20 feet thereof, all in the County of Multnomah, State of Oregon.

The claim of exemption is based upon ORS 307.130, which exempts from taxation such real or personal property owned by "* * * incorporated * * * chari-

table \* \* \* institutions \* \* \* as is actually and exclusively occupied or used in the \* \* \* charitable \* \* \* work carried on by such institutions"; on ORS 307.140, which exempts from taxation "[a]ll houses of public worship \* \* \*" owned by religious organizations and used for public worship; and ORS 307.145, which exempts from taxation schools and academies "\* \* \* owned \* \* \* by incorporated eleemosynary institutions or by incorporated religious organizations, used exclusively by such institutions or organizations for or in immediate connection with educational purposes \* \* \* "①

_____

① ORS 307.130:

"Upon compliance with ORS 307.162, the following property owned or being purchased by incorporated literary, benevolent, charitable and scientific institutions shall be exempt from taxation:

"(1) Except as provided in ORS 748.545, only such real or personal property, or proportion thereof, as is actually and exclusively occupied or used in the literary, benevolent, charitable or scientific work carried on by such institutions.

"(2) Parking lots maintained solely for the use, without charge, of persons going to and from the property exempted under subsection (1) of this section, but not if such lots are used for parking or other purposes not connected with the use and maintenance of such property."

(Subsections (3) and (4) not relevant.)

ORS 307.140:

"Upon compliance with ORS 307.162, the following property owned or being purchased by religious organizations shall be exempt from taxation:

"(1) All houses of public worship and other additional buildings used solely for entertainment and recreational purposes by religious organizations, the lots on which they are situated, and the pews, slips and furniture therein. However, any part of any house of public worship which is kept or used as a store or shop or for any purpose other than for public worship or schools shall be assessed and taxed the same as other taxable property.

"(2) Parking lots maintained solely for the use, without charge, of persons going to and from the buildings exempt under subsection (1) of this section, but not if said lots are

There is no dispute of fact.

Archdiocese was originally incorporated in 1909 as "Archdiocese of Oregon City" under Or Laws 1907, ch 129, entitled an "Act Authorizing the Formation of Religious Corporations." In 1929, supplementary articles were filed changing the corporation's name to the one it now bears.

The department's answer admits an allegation in the complaint that Archdiocese is "an eleemosynary corporation, created and existing under the laws of Oregon for religious and charitable purposes."

The territory in which Archdiocese functions extends from the Washington border on the north to the California border on the south, and from the Pacific Ocean on the west to the summit of the Cascades on the east.

A two-story building on the land in question (designated as 2816-38 East Burnside Street) houses the administrative offices of Archdiocese, and is known as the Chancery Office. Here, also, are published the Catholic Sentinel, described in the testimony as "an arm of the Archdiocese to inform the Catholic laity or the Catholic clergy also of the work and teachings of the church" and a monthly publication called "My Sunday Missal," which contains the readings and

---

used for parking or other purposes not connected with the use or maintenance of the buildings."

ORS 307.145:

"(1) If not otherwise exempt by law, the schools, acadamies and student housing accommodations, owned or being purchased by incorporated eleemosynary institutions or by incorporated religious organizations, used exclusively by such institutions or organizations for or in immediate connection with educational purposes, are exempt from taxation."

(Subsection (2) not relevant.)

prayers and hymns used in the Sunday and daily liturgy of the church, as well as a Marriage Missal and Funeral Missal.

As stated by the witness, Father Bertram Griffin, Chancellor of the Archdiocese:

"The schools, the churches and whatever social or charitable agencies that are directed by the churches are all administered by the Chancery Office."

Sixty grade schools operated by the parish churches and 13 secondary schools are thus administered and the entire second floor of the building is devoted to this use.

The numerous charitable and social agencies concerning which there is evidence engage in their work in the community at large and the benefits of their activites are open to people of every faith and race.

During the 10-month period between January and October, 1970, there were held in the Chancery Office 72 conferences (involving other than merely staff people) relating to charitable and social work, and 62 such conferences relating to formal education.

In addition to the foregoing, a part of the first floor of the building is used for the conduct of the business of the Canon Law Court, a tribunal of the Roman Catholic Church which deals with issues of faith and of sacramental participation. The judges of the tribunal are all ordained priests and the tribunal does not hear civil disputes.

No profit is derived from any of the activities of Archdiocese; it receives its funds from free-will offerings, primarily from bequests and devises by will. Such offerings provided the funds which paid for the prop-

erty whose tax status is here in issue. The record is indefinite as to when Archdiocese acquired the property, but it is agreed that in 1963 Archdiocese sought and was granted exemption from taxation of the property by Multnomah County and that it continued to be exempt until 1970. A stipulation entered into by the parties contains this provision:

"18. Prior to the fiscal year 1963-64, exemptions from taxation had always been allowed by the Multnomah County Assessor for real and personal properties owned and used by plaintiff for its Canon Law Tribunal and the publication of its diocesan newspaper and other Catholic literature."

It was further stipulated at the trial, and the stipulation is repeated in the department's brief, that the second story of the building, which is used entirely for educational purposes, is exempt from taxation under ORS 307.130, relating to literary, scientific and charitable institutions, and ORS 307.145, relating to educational institutions. This stipulation includes a part of the property used as a parking lot.

I am unable to accept the contention of Archdiocese that the Chancery Office is a "house of public worship" and therefore exempt from taxation under ORS 307.140. According to the testimony of Father Griffin, no religious services are held in the building except for an occasional mass in the auditorium. While the liberal interpretation of "worship" testified to by Father Griffin—for example, people working together on a religious project, such as an act of service or charity, is an act of worship—is no doubt good theology, I think that is not the sense in which the word is used in the statute and that, as the Supreme Judicial Court of Massachusetts said, in *Evangelical Baptist B. & M.*

*Soc. v. City of Boston,* 204 Mass 28, 31, 90 NE 572 (1910):

> "* * * The purpose of the provision was to exempt from taxation ordinary church edifices owned and used in the usual way for religious worship. * * *"

See also *Parkhurst v. Dept. of Revenue,* 4 OTR 586, 591 (1971); *Town of Woodstock v. The Retreat,* 125 Conn 52, 3 A2d 232 (1938). There may be buildings or parts of buildings which, though they are not commonly designated as churches, would come within the statute; but nothing in the evidence here warrants such a conclusion as to the Chancery Office.

I go now to consideration of questions arising under ORS 307.130 and 307.145.

As stated in the department's brief, an organization which was incorporated for a religious purpose may also qualify for an exemption as a purely public charity (citing *West Indies Mission Appeal,* 387 Pa 534, 120 A2d 773 (1957); *Board of Home Missions, Etc. v. City of Philadelphia,* 266 Pa 405, 109 A 664, 665 (1920)). See also *Gerke, Etc. v. Purcell,* 25 Ohio St 229 (1874).

The question of exemption from taxation of the second story of the building, devoted entirely to school administration, is no longer an issue in the case. As stated above, the stipulation of the parties is based not only on ORS 307.145, relating to educational institutions, but also on ORS 307.130, relating to "literary, benevolent, charitable and scientific institutions." In *Gerke, Etc. v. Purcell, supra,* the court held that parochial schools, while not exempt from taxation as public schools (which was said to mean "such as belong to the public"), were exempt under a provision of the

statute exempting "institutions of purely public charity." This classification, the court said, was supported by the principle, as stated by the Massachusetts court in *American Academy of Arts and Sciences v. Harvard College,* 12 Gray 582 (1832), that "a gift designed to promote the public good by the encouragement of learning, science and the useful arts, without any particular reference to the poor, is a charity." (25 Ohio St at 243.)

The concession of the department as to the second floor of the building is fully supported by the law and the evidence and is accepted by the court.[2]

As to the remainder of the building, the portions devoted to publication of the Catholic Sentinel and the missals, general administration and the work of the Canon Law Tribunal, Archdiocese claims exemption under ORS 307.130 as a charitable institution. The department argues that, while the activities referred to are religious, they "can by no means come within any definition of the word charity," that their "primary purposes are secular in nature, and we cannot look to

---

[2] There is authority that would support a similar concession as to the Catholic Sentinel. *Northwestern Pub. House v. City of Milwaukee,* 177 Wis 401, 188 NW 636 (1922) (opinion by Rosenberry, J.), held exempt from taxation property of a corporation of the Lutheran Church used for "the printing, publication, and dissemination of * * * books, periodicals, and literature as may be by its members considered beneficial to the Evangelical Lutheran faith or principles, and all matters incidental thereto, * * *." In the course of its opinion, the court said:

"* * * The importance to a sectarian body of controlling and managing the publication and distribution of the literature inculcating its doctrines is well understood. Instilling into the minds of the young, stimulating and deepening the convictions of the mature, in matters relating to the faith and doctrine of the Lutheran Church, by the publication and distribution of printed matter, are certainly educational purposes within the meaning of that term as it is used in Section 70.11. * * *"

the benevolent and charitable exemption statutes with respect to this property."

■ While authority may be found to support this view of the meaning of the word "charitable" as used in the statute (see, e.g., *Watterson v. Halliday,* 77 Ohio St 150, 178, 82 NE 962 (1907)), it is not the view of the Supreme Court of Oregon. What that court has said on the subject is, of course, binding on this court.

Some 80 years ago, MR. JUSTICE ROBERT S. BEAN, speaking for the court in *Pennoyer v. Wadhams,* 20 Or 274, 281-282 (1891), said:

"* * * Tested by all the definitions and descriptions of charities found in the textbooks and the illustrations furnished by the decided cases, it is clear that the devise * * * was for a public charity. *Its object was the advancement of religion* through the erection of a house for the public worship of God and supplying a dwellinghouse for the minister thereof, or, as the donor himself states it, 'for the purpose of advancing and propagating the Christian religion through the agency of the Presbyterian Church.' * * *" (Emphasis added.)

Closely in point and, as I think, decisive of the issue here is *Poe v. State Treasurer,* 144 Or 561, 25 P2d 924 (1933). The question in that case was whether a gift by will to the First Church of Christ, Scientist, was exempt from inheritance tax under a provision of the statute which granted such exemption to devises, bequests, legacies or gifts to any corporation, society, institution, person or persons in trust for charitable, benevolent or educational purposes. The will of the donor directed that the gift be used "in the interest of the Christian Science Monitor." The claim of exemption was sustained, the court saying in an opinion by MR. JUSTICE RAND:

"There can be no question that the First Church

of Christ, Scientist, the Mother Church, was a charity since *the avowed object of its foundation was for the advancement of religion.* * * *" (144 Or at 569.) (Emphasis added.)

Counsel for the department suggested at the oral argument that where a gift is to an organization which is "taking it in trust to render charity," the definition of charity is more liberal than in a case such as the present one. But that is not the theory on which the case was decided, and the concluding words of the opinion indicate the court's awareness of the rule of "strict though reasonable" construction (*Mult. School of Bible v. Mult. Co.*, 218 Or 19, 343 P2d 893 (1959)) uniformly applied to tax exemption statutes:

> "We recognize the principle that exemptions from taxation must be expressed in the statute and are not to be read into it by implication. Inheritance and Estate Taxes, by Pinkerton and Millsaps, section 211, p. 117. Under this statute, the exemption is expressly granted and it is the duty of courts to give to the statute the effect which the legislature intended it to have." (144 Or at 571.)

Moreover, the same understanding of the meaning of "charity" has been expressed by other courts in ad valorem tax cases. I have already quoted from the Ohio case of *Gerke, Etc. v. Purcell* on that subject. A number of Pennsylvania cases are in accord. As the Supreme Court of that state said in *West Indies Mission Appeal, supra*:

> "We have consistently held that organizations which have a religious purpose may qualify for an exemption as a 'purely public charity' even though they are not 'actual places of religious worship.'" (387 Pa at 539.)

After discussing prior decisions, the court said:

> "* * * In view of these cases it may be safely

said that whatever is gratuitously done or given in relief of the public burdens or for the advancement of the public good is a public charity. In every such case, as the public is the beneficiary, the charity is a public charity. * * *" (387 Pa at 540.)

See, also, *Assessor of Dover v. Dominican Fathers, Etc.,* 334 Mass 530, 137 NE2d 225 (1956).

One of the earlier Pennsylvania cases seems to be quite similar to the present case. In *Board of Home Missions, Etc. v. City of Philadelphia, supra,* the court held exempt part of a building used as the "headquarters" building of the home mission work of the Methodist Episcopal Church in America under a statute exempting "all institutions of benevolence or charity * * * maintained by public or private charity." The court said:

"* * * a purely public charity, * * * is not necessarily one solely controlled by the State, but extends to * * * charitable institutions which are not administered for any individual gain; and in *Fire Ins. Patrol v. Boyd,* 120 Pa. 624, we held that the true test of a public charity is the character of the objects sought to be attained, saying (p. 645), to bring the hearts of an indefinite number of persons 'under the influence of education or religion,' was a proper object of public charity; * * *." (266 Pa 405 at 411.)

The department contends that "where a state statute provides for an exemption of religious organizations and the property of such organizations cannot come within the provisions of the exempting statute, they cannot escape taxation under a general clause exempting the property of charitable and benevolent institutions." *Commonwealth v. Thomas,* 119 Ky 208, 83 SW 573 (1904), cited by the department, supports

this proposition and *Watterson v. Halliday, supra,* also cited, apparently supports it.

*Commonwealth v. Thomas* presented the question whether a trust set up in a will "to promote the advancement of primitive Christianity as taught by the primitive church" was exempt from taxation under constitutional provisions exempting "places actually used for religious worship" and the property of "institutions of purely public charity." The court held that no place of religious worship was involved and that, while the trust was a charity, it was not a "purely public charity" because it was not the duty of the state "to teach or disseminate religion as such" and, moreover, that if the claim of exemption with regard to "institutions of purely public charity" were approved, that provision would embrace "all the property of a sectarian denomination" and there would be no need of the provision regarding places of religious worship.

This construction would seem to be an application of the maxim *expressio unius est exclusio alterius,* a useful guide to interpretation, but one not to be mechanistically applied.

Whatever may be thought of the Kentucky court's decision, whether or not it represents (to use Mr. Justice Cardozo's word) a "grudging" reading[8] of that state's Constitution, the two sections of Oregon Revised Statutes with which we are now concerned do not deal

---

[8] "Exemptions from taxation are not to be enlarged by implication if doubts are nicely balanced. *Chicago Theological Seminary v. Illinois,* 188 U. S. 662, 674, 23 S. Ct. 386, 47 L. Ed. 641 (1902). On the other hand, they are not to be read so grudgingly as to thwart the purpose of the lawmakers." *Trotter v. Tennessee,* 290 US 354, 24 S Ct 138, 78 L Ed 358 (1933), quoted with approval in *Mult. School of Bible v. Mult. Co., supra,* 218 Or at 28-29.

altogether and precisely with the same subjects.④ ORS
307.130 exempts the property of *incorporated* literary,
benevolent, charitable and scientific institutions, while
ORS 307.140 exempts houses of public worship owned
by religious *organizations,* whether incorporated or
not. An unincorporated group could not get the bene-
fit of ORS 307.130 except as to property specifically
described in ORS 307.140. It cannot, therefore, accu-
rately be said that ORS 307.140 serves no purpose if
the word "charity" in ORS 307.130 is construed to in-
clude the advancement of religion in accordance with
the decisions of our Supreme Court and other courts.
It is appropriate to quote again the language of the
opinion in the *Poe* case:

> "* * * Under this statute [ORS 307.130] the
> exemption is expressly granted and it is the duty
> of courts to give to the statute the effect which the
> legislature intended it to have." 144 Or at 571.

In other jurisdictions having statutes like ORS
307.130 and 307.140, the courts have not agreed with
the Kentucky and Ohio courts on the question now
under consideration. I quote again the language above
quoted from the *West Indies Mission Appeal*:

> "We have consistently held that organizations
> which have a religious purpose may qualify for an
> exemption as a 'purely public charity', even though
> they are not 'actual places of religious worship'."
> (387 Pa at 539.)

In *Convention v. Portland,* 65 Me 92 (1876), the
court held that certain property which could not qualify
as a "house of religious worship" was, nevertheless,

---

④ ORS 307.130 and 307.140 were originally part of the same
statute enacted by the territorial legislature in 1854. Deady, § 4,
p 894. The history of the legislation is traced in *Mult. School of
Bible v. Mult. Co.,* 218 Or at 24-25.

entitled to exemption from taxation because it was occupied and used for religious purposes by a religious corporation and came under a statute exempting the property of "charitable institutions incorporated by this state." The court said:

> "* * * No other statutory provisions apply to this case. The provisions of c. 6, § 6, clause 4, and clause 8 of § 14, relate to local parishes, and not to an institution such as the plaintiffs are described to be." (65 Me at 94.)

See also *Park Association v. City of Saco*, 127 Me 136, 142 A 65 (1928); *Universalist Church v. City of Saco*, 136 Me 202, 7 A2d 428 (1939).

One other contention of the department needs to be noticed. It is said in the brief "* * * for such an organization [one incorporated for a religious purpose] to be entitled to an exemption, charity must be its primary object and the use of the property for business purposes even though the proceeds are devoted to charity does not entitle it to an exempt status. * * *" Citing *Mult. School of Bible v. Mult. Co., supra.*

The first clause of the quoted language is obviously based upon an understanding of the meaning of "charity" in the statute quite different from mine and which finds little support in the adjudicated cases and is contrary to the decisions of the Supreme Court of Oregon. That subject has already been covered in this opinion.

As to the second clause, the facts here are totally different from those in the *Mult. School of Bible* case, at least insofar as exemption from taxation was there denied. That denial was as to property of the Bible School occupied and used in the operation of a profit-making business—the sale of Sunday School supplies,

etc., in a store in downtown Portland. The fact that the revenues derived from the business were devoted to the charitable objects of the Bible School did not enable it to escape the tax, for this state does not recognize the so-called "destination-of-income" rule as determining exemption from taxation. See *Bd. Pub., Meth. Church v. Tax Com.*, 239 Or 65, 396 P2d 212 (1964).

No profit-making business is carried on in the Chancery Office and there is no "destination-of-income" rule involved. The uncontradicted evidence demonstrates that the property sought to be taxed is all owned, occupied and used for the advancement of religion, a charitable use by a religious nonprofit corporation, and is, therefore, not subject to taxation. ORS 307.130.

Contemporaneous administrative construction is relied on by Archdiocese in support of its position. I have set out above the stipulation of the parties in this regard. There is dispute about its meaning, counsel for the department contending that he intended to stipulate only that the property referred to had been exempt from taxation "for the period that they had owned the property, which was 1959." (This is the only statement in the record as to the date of acquisition of the property. Counsel for Archdiocese did not take issue with it.) The stipulation recites in substance that prior to the fiscal year 1963-64 the Assessor of Multnomah County had "always" allowed exemption from taxation properties used by Archdiocese for its Canon Law Tribunal and the Catholic Sentinel and other Catholic literature. As the Catholic Sentinel, according to the testimony, was founded 70 years ago, it could well be argued, in view of the word

"always," that the exemption as to it has been allowed during the entire period of the newspaper's existence.

I find it unnecessary,' however, to resolve this dispute, as I have come to my decision without regard to the question of administrative construction.

The order of the Department of Revenue is set aside.