## CORPORATION OF THE PRESIDING BISHOP OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS *v.* DEPARTMENT OF REVENUE

James H. Bean, Lindsay, Nahstoll, Hart, Dafoe & Krause, Portland, represented plaintiff.

Alfred B. Thomas, Assistant Attorney General, Salem, represented defendant.

Decision for defendant rendered December 24, 1975.

CARLISLE B. ROBERTS, Judge.

Plaintiff is a Utah corporation, *authorized to do business* in Oregon. It appealed to the court as a re-

ligious and charitable organization (which is usually organized as a nonprofit corporation under a statute similar to ORS chapter 61). It sought real property and personal property tax exemptions for the tax years 1973-1974 and 1974-1975 with respect to a 540-acre farm and personal property used in farming. The real property was identified in the Marion County Assessor's roll as Account Nos. 3602-001, 3603-000, 3603-001, 3607-000 and 3609-000; the personal property was Account No. 53370-000. Plaintiff cited the provisions of ORS 307.130, and ORS 307.140, relating to property tax exemptions of charitable and religious organizations. The County Assessor of Marion County denied the requested exemptions and his action was affirmed by the defendant in its Order No. VL 75-9, dated January 21, 1975. Plaintiff appealed from that order.

Defendant admits "that plaintiff owns the [farm] property and qualifies as a charitable or religious corporation." Defendant contends that exemption does not automatically follow ownership because both ORS 307.130 and 307.140 require that the property be *used* in the principal undertaking on the basis of which the corporation was granted tax exemption (*e.g.*, charity, religion, science); further, Oregon long has followed a policy of denial of exemption for property of an exempt corporation which is used for noncharitable purposes, even though the proceeds from such use are employed in carrying out the principal goals of the corporation. On this last point, defendant's order recites:

> "The Petitioner's welfare farm is essentially a profit-making enterprise. Although produce from the farm and the profits from much of the produce are channeled into the welfare program of the Latter Day Saints Church, the operation remains primarily commercial in nature. The Petitioner con-

tends that notwithstanding the farm's profit-making nature, the destination of the income into the welfare program is controlling when construing the exemption statutes.

"Oregon requires a direct charitable use rather than a charitable destination of the income produced from the profitable operation of an income-producing property. * * *"

The defendant, in its order denying exemption, analogizes the operation of the commercial farm with the words "store or shop" as used in ORS 307.140(1) (1971 Replacement Part)[1] which states:

"* * * [A]ny part of any house of public worship which is kept or used as a store or shop or for any purpose other than for public worship or schools shall be assessed and taxed the same as other taxable property."

Plaintiff contends that the advancement of religion is the equivalent to a charitable purpose; that the subject property is a "welfare farm" and, as such, is an

---

[1] The 1971 act is applicable to the first tax year in question, 1973-1974. However, for the second year, 1974-1975, ORS 307.140, as amended by Or Laws 1973, ch 397, was in effect. The first sentence of the amended subsection enlarges the exemption and the second sentence narrows it, thus (the new words being emphasized, the deleted words bracketed):

"(1) All houses of public worship and other additional buildings *and property* used solely for *administration, education, literary, benevolent, charitable,* entertainment and recreational purposes by religious organizations, the lots on which they are situated, and the pews, slips and furniture therein. However, any part of any house of public worship *or other additional buildings or property* which is kept or used as a store or shop or for any purpose other than [for public worship or schools] *those stated in this section* shall be assessed and taxed the same as other taxable property." (Emphasis supplied.)

In this case, the difference is not deemed significant. Aid in construing the amended statute is found in *Archdiocese of Portland v. Dept. of Rev.,* 5 OTR 111 (1972), *aff'd* 266 Or 419, 513 P2d 1137 (1973).

integral part of the church's welfare program (*i.e.,* the farm is not an unrelated business income property; and a charitable organization does not lose its right to exemption merely because it competes with other businesses).

The plaintiff's witnesses testified in detail as to the welfare program of the church. The testimony is summarized as follows: Except where the members are few and are widely scattered, the church is divided into ecclesiastical "wards" with an average membership of about 600 persons. Presiding over each ward is a bishop, a local man who serves without compensation. "In addition to other duties, the bishop must ensure that no ward members lack the necessities of life." His resources are the "fast offering fund" and the "bishop's storehouse." The fund is derived from a cash offering of individual members and, nationwide, amounts to millions of dollars. The second resource is a stock of commodities, consisting of food and fiber, much of which is produced on welfare farms and processed in canneries, mills and packaging plants owned by the church, utilizing both paid labor and voluntary labor contributed by church members. Additionally, welfare recipients are expected to work to the extent of their ability.

Both production and distribution are handled on a ward basis but with overall supervision by the church's Salt Lake City headquarters. Each ward in the church estimates in advance its annual requirements of welfare supplies and the aggregate of all these estimates then becomes the basis for an overall church production budget. The budgeted requirements are then prorated to the appropriate wards for production, utilizing urban areas for manufacturing products and agricultural areas for agricultural assignments.

There are presently in excess of 500 L.D.S. church

welfare projects in the United States producing, processing and distributing 160 different commodities, primarily foodstuffs, to the needy.[2] The subject property is a unit in this carefully organized program.

Unpaid representative of four different Oregon church groups direct the farm work of the subject property, hiring a paid manager experienced in farming as the actual operator. The farm manager testified that, in addition to the 540 acres owned by the church, 200 acres more are leased, giving a total of 700 acres of tillable land, deemed necessary for efficiency in operation and the requirements of crop rotation. The manager had three full-time employees and employed additional paid help for summer irrigation. Church members and those needing assistance were encouraged to help with the work but the farm manager's testimony showed that such voluntary labor was not significant.

In summer, the manager hired additional labor, usually consisting of six or seven high school students, from mid-June to September 1. The volunteer labor, offered by church members, generally reported on Saturdays and totaled 3,000 man-hours during a year. This labor was used chiefly in "training up" blackberries and similar work. In summer months, if no volunteers had been available, the manager estimated that he would have required two additional high school students.

For the farm year beginning January 1, 1973, 230 acres were planted to beans (including 15 acres allotted to the welfare program, the "surplus" acreage

---

[2] Plaintiff's testimony created an inference that the benefits of the welfare program, in the usual course, are available only to church members but that, in dire emergencies (citing a Managuan earthquake and a Spearfish, South Dakota, flood), all victims are aided.

being "on contract" with a commercial food processor) ; 50 acres were planted to brussels sprouts, contracted to the same processor; 35 acres in blackberries and 18 acres in blueberries were contracted to a Newberg packer; 72 acres in grass and 80 acres in soft wheat were sold on the open market; 5 acres in barley and 18 acres in oats were partly sold in St. Paul and partly on the open market. For the farm year beginning January 1, 1974, there was some change, contracts being entered into for the sale and delivery of corn, beans and brussels sprouts, with a somewhat different spread.

In each instance, the farm manager sought the highest price obtainable at the time, in competition with other farmers. The overhead costs of the operation were paid from the proceeds of the crop contracts, the profits being paid into the bishop's fund.

During the years in question, the only requirement of the church under its allotment system was that the farm utilize 15 acres for the production of beans (from which 4.7 tons per acre were harvested in 1974 but somewhat less in 1973). Canned goods, derived from the beans produced on the farm and canned at the church's cannery in Portland, were distributed to the local bishop's storehouse and to the Salt Lake City headquarters, for use by needy people.

Commodities proven to be surplus, after a year in the storehouse, were sold on the market. The funds thus derived were earmarked for the needy. None went into the general funds of the church.

The court finds that the farm is operated like any other profit-seeking, commercial farm except that it is partially aided by volunteer labor. The amount of volunteer labor, totaled for the church as a whole, appears impressive, but not as to subject property. The

church's requirement of allotted production does not seem disproportionate to that of any profit-seeking farm operator who believes in and practices tithing, entitling him to a tax-deductible contribution *pro tanto* for income tax purposes.

The decision, then, turns on Oregon's use or acceptance of the "destination-of-income" theory. Plaintiff seeks its application, the defendant rejects it.

This court holds for the defendant on the basis of *Bd. Pub., Meth. Church v. Tax Com.,* 239 Or 65, 396 P2d 212 (1964), *Mult. School of Bible v. Mult. Co.,* 218 Or 19, 343 P2d 893 (1959), *Umatilla Co. v. City of Pendleton,* 9 Or App 55, 495 P2d 287 (1972), and *Archdiocese of Portland v. Dept. of Rev.,* 5 OTR 111 (1972). The case of *YMCA v. Dept. of Rev.,* 268 Or 633, 522 P2d 464 (1974) is distinguished.

■ All discussions of this question of tax exemption begin with an affirmation that Oregon historically follows a "strict but reasonable construction." *Emanuel Lutheran Char. v. Dept. of Rev.,* 4 OTR 410 (1971), and cases cited therein.

The "destination-of-income" theory, in connection with a tax exemption, was closely scrutinized in *Mult. School of Bible, supra.* In that case, the plaintiff was a nonprofit corporation, engaged in exempt "literary, benevolent and educational activities," and sought to include therein the operation of a retail store in one of Portland's largest retail business districts. Its stock of merchandise consisted, in the main, of Sunday School supplies, Bibles of various styles, missionary film strips, moving pictures, picture projection machines, religious records, greeting cards, and miscellaneous novelties. "While the store caters to missionaries and Sunday School teachers, without regard to denomination, its merchandise is sold to whomsoever

of the public may be interested in buying." 218 Or at 23. The court rejected the claim of exemption, stating its reason, 218 Or at 42:

"We hold plaintiff's business, known as the Christian Supply Center, is an enterprise for the purpose of business and profit which comes in direct competition with businesses of like nature and kind carried on elsewhere by other persons and does not comply with ORS 307.130, supra, so as to entitle it to the [property] tax relief sought, even though its net gains flow to and are devoted by the Bible School to religion or education."

In *Bd. Pub., Meth. Church, supra,* a nonprofit corporation, organized and controlled by the Methodist Church, also operated a book store in downtown Portland. "The evidence reflects that the merchandise in the store suggests a little more flavor of religious significance than other stores but any unknowing customer would find little difference between plaintiff's store and other book stores in the same business area. * * *" 239 Or at 67. The plaintiff sought exemption from corporation excise taxes under ORS 317.080, providing for exemption of corporations organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes, no part of the net earnings of which inured to the benefit of any private stockholder or individual.

The court stated, 239 Or at 69-70:

"* * * The competitive, commercial nature of its business precludes exemption to plaintiff.

"However, plaintiff's primary contention has been that the State of Oregon has adopted what has become known as the 'destination of income' theory for determining the right to exemption. It has been argued that it is the destination of the income not the source thereof that eventually determines the right to exemption."

The court rejected the contention. Its decision supplies a useful outline of the history of the destination-of-income theory for federal income tax purposes, its implementation by some court decisions, and its eventual restriction by congressional acts. The court continued, 239 Or at 73:

"In *Mult. School of Bible* [218 Or 19, 343 P2d 893 (1959)] it had been argued that the property in question was exempt because all of the profits were 'immediately channeled back into the school, where it was employed for purposes for which the school was organized.' This, we held, did not permit exemption 'for this mercantile enterprise maintained by the school.' 218 Or at 39. In *Oregon Physicians' Service* [220 Or 487, 349 P2d 831 (1960)] we said that even if all of the proceeds of that plaintiff's business were devoted to charity it would not permit exemption.

"It is, of course, recognized that the legislature could not have had the last-cited cases in mind when it was in session in 1959. However, the cases reflect, by citation to the earlier cases, that this has been recognized as the established rule in Oregon. It is also significant that the rule was equally recognized in both property and income taxation. We think the legislature, in 1959, was well aware that both the State Tax Commission and the Oregon courts had given no recognition to the destination of income rule that had been adopted by some of the Federal decisions and which Congress found necessary to clarify.[9] Our legislature had no need for a similar enactment."

The rule that this state does not recognize the so-called "destination-of-income" test is reiterated in *Archdiocese of Portland, supra,* 5 OTR at 124, and in *Umatilla Co., supra,* 9 Or App at 58.

---

[9] In fact, clarification was achieved by *repeal.*

Plaintiff's contention challenges important legislative fiscal, social and commercial policies. The threats to governmental fiscal policies and to tax paying commercial enterprises, engendered by the rule espoused by plaintiff, have been delineated in studies of its use for federal income tax purposes. *Bd. Pub., Meth. Church, supra,* 239 Or at 70-71. *See also* 6 Mertens *Law of Federal Income Taxation* §§ 34.14 and 34.14a. Section 34.14 reads in part:

> "* * * It is obvious that income is generally necessary for carrying on an organization's charitable work. The earliest test was the use to which the income was put and not its source. This test came to bear the popular name of 'destination of income' test. * * *"

Section 34.14a reads in part:

> "* * * The tax-exempt status of eleemosynary institutions had enabled them to use their profits tax-free to expand operations, while their competitors could expand only with the profits remaining after taxes. Also, in a number of instances, some of these organizations used their tax exemptions to purchase a business. They acquired commercial ventures with little or no investment on their own part and paid for it in installments out of subsequent earnings. Moreover, by reason of the fact that their earnings were not subject to tax, tax-exempt organizations were enabled to outbid taxable corporations in the purchase of other businesses."

The earliest case usually cited in a study of the development of the destination-of-income rule is *Trinidad v. Sagrada Orden De Predicadores,* 263 US 578, 44 S Ct 204, 68 L Ed 458 (1924), relating to the application of the federal corporation income tax upon a religious order in The Philippines. All of its properties were held for religious, charitable and educational purposes. The income of the corporation was derived

from investments of its capital, from which it derived nontaxable rents, dividends and interest and, additionally, small profits from occasional sales of wine, chocolate and other articles purchased by the corporation and supplied for use in the corporation's churches, missions, schools and other subordinate agencies. The federal administrator contended that, as to these sales, the plaintiff was operating for business and commercial purposes. He deemed irrelevant the contention that the income from the properties was devoted exclusively to religious, charitable and educational purposes. The Supreme Court affirmed a reversal of the administrator, holding that in using the properties to produce the income, the corporation was adhering to and advancing the purposes for which it was founded and not stepping aside from them or engaging in a business pusuit. The court pointed out that in the transactions in wine, chocolate and other articles, the corporation was not selling to the public *or in competition with others.* "That the transactions yield some profit is, in the circumstances, a negligible factor. Financial gain is not the end to which they are directed." 263 US at 582, 68 L Ed at 460.

The decision in *Trinidad, supra,* seems sufficiently innocent today; if it were a case of first impression in Oregon, it might well be found exempt under *YMCA v. Dept. of Rev., supra.* But this decision, involving a trifling amount of noncompetitive profits, served as a springboard for a proliferation of cases in which religious, charitable and educational organizations engaged in competitive business operations which had no relation to their exempt nonbusiness purpose.[*]

A later case, often cited as a part of this history,

[*] Note, *Criticized Uses of Federal Tax Exemption Privileges by Charitable Foundations and Educational Institutions,* 98 U Pa L Rev 696 (1950); Note, *The Modern Philanthropic Foundation: A Critique and a Proposal,* 59 Yale LJ 477 (1950).

is *Roche's Beach, Inc. v. Commissioner*, 96 F2d 776 (2d Cir 1938), 38-1 USTC ¶ 9302, 21 AFTR 262, in which it was held that a business corporation, with no reference to charitable purposes in its articles but organized specifically for the purpose of eventually turning all of its income over to the owner's testamentary charitable trust, was exempt as a corporation organized and operated exclusively for charitable purposes. As the court noted, "[t]his business is quite extensive. * * *" 96 F2d at 777, 21 AFTR at 263. Nevertheless, the court held that the destination of the income was more significant than its source, citing *Trinidad, supra.* There was an oft-noted dissent by Judge Learned Hand. He pointed out that the business income of the taxpayer in the *Trinidad* case was "very trifling." It was his belief that, under the statute, when an exempt parent resorts to a business subsidiary, any income so obtained becomes taxable.

A third significant case in this history was *C. F. Mueller Co.*, 14 TC 922 (1950), which rejected the destination-of-income test and was reversed upon appeal by 190 F2d 120 (3d Cir 1951), 40 AFTR 963. The facts before the Tax Court were that C. F. Mueller Company, a highly successful New Jersey corporation, was taken over by a new corporation of the same name, but "organized exclusively for charitable, scientific, literary, and/or educational purposes and no part of this income or property shall inure to the private benefit of any stockholder, director or officer or any individual or corporation other than New York University for the exclusive benefit of its School of Law * * *." 14 TC at 924. The new corporation carried on the business of the old company, precisely as before, but paid all profits to the university (less amounts due on purchase loans). It sought income tax exemption, relying on the *Trinidad* case. The Tax Court held that the liberal test of the ultimate destina-

tion should not be stretched and distorted to cover a corporation within the facts stated, and declined to follow *Roche's Beach, Inc.,* case (citing Judge Hand's dissent therein).

In reversing the Tax Court, the Court of Appeals pointed out that the petitioner's certificate of incorporation, a part of the merger agreement, recited that the petitioner's purpose was charitable, requiring the profits and assets available for distribution to be paid only to New York University for the exclusive benefit of the School of Law. The decision held, in effect, that a corporation designed to compete as fully as possible with tax paying profit-making corporations was still exempt under the destination-of-income theory. "The policy, as these cases indicate, is that the benefit from revenue is outweighed by the benefit to the general public welfare gained through the encouragement of charity. * * *" 190 F2d at 122, 40 AFTR at 965.

*C. F. Mueller Co.* case, *supra,* was the genesis of congressional reform. In the Revenue Act of 1950, the Congress enacted basic provisions dealing with "unrelated business income." Int Rev Code of 1954, § 501, as amended (previously, 1939 Code, § 424). The provisions were designed to cope with the abuses disclosed at the hearings on that act, which was primarily the problem of unfair competition. 6 Mertens *Law of Federal Income Taxation* § 34.14a.

The plaintiff indicates that the Oregon Supreme Court may now be persuaded that the destination-of-income rule should prevail, citing *YMCA v. Dept. of Rev., supra,* in which the court allowed an exemption of a kitchen and cafeteria facilities which were operated in competition with private businesses, because such food service implemented the objectives of the

charitable corporation in a substantial way. The court said, 268 Or at 635:

"* * * A charitable enterprise does not lose its exemption merely because it engages in competition with businesses which are subject to taxation. Nor is the exemption lost because the property is not *required* in carrying out the primary goals of the charity. It is enough if the activity undertaken on the property substantially contributes to the furtherance of the charity's goals. If this test is met, it is immaterial that the charity competes with similar activities by those who are subject to taxation." (Footnote omitted.)

The plaintiff herein relies strongly upon the foregoing statement and it becomes the duty of this court to determine whether a commercially competitive farm project can be more closely analogized to the YMCA's food service or to the YMCA's properties rented for a barber shop and for a tailor shop (which the Supreme Court held to be taxable).

Drawing lines between taxation and exemption is difficult. (The points on which decision must rest become narrower case by case, of course.) Two different public policies are in conflict. But the significant facts on which the *YMCA* decision was based and those present here are deemed sufficiently distinguishable to require affirmance of the defendant's order, in keeping with the current state of the decisions construing the pertinent acts. A significant legislative policy is involved and the Supreme Court cases which have spoken directly to the problem have not been overruled. The weight of Oregon authority requires that plaintiff's farm property must be recognized as a commercial activity, subject to property taxation.[9]

---

[9] In future years, the 15 acres allotted for production of a crop to be given in kind to the bishop's storehouse may pos-

If the provisions of ORS 307.130 and 307.140 are to be enlarged by acceptance of the destination-of-income rule, the legislature must act.

Defendant's Order No. 75-9 is affirmed and defendant is entitled to its costs.

---

sibly be exempt on an allocated basis. The application for exemption would have to be made annually, inasmuch as the testimony showed that a different acreage was used each year, on a crop-rotation basis. Insufficient testimony was placed in the record to enable the court to act upon this question for the years before the court.

Plaintiff has cited its experience in Idaho where it eventually gained property tax exemption. The decision in *Malad Second Ward of the Church v. State Tax Com'n*, 75 Idaho 162, 269 P2d 1077 (1954), refused a church farm exemption under statutes akin to ORS 307.130 and 307.140 (1971 Replacement Part). An amended Idaho Code, § 63-105(c), effective January 1, 1970, permitted tax exemption of property "which, in the case of a charitable organization, is not directly related to the charitable purposes for which such charitable organization exists, * * *." This act was construed on June 28, 1973, in an unreported decision, *In the Matter of the Appeals of the Pocatello et al Church of Jesus Christ of L.D.S. v. Ralph Lacy, Bannock Co. Assessor et al*, Dist Ct, 6th Jud Dist, Bannock Co., Idaho (No. 30119), which held that the amended law exempted the church's welfare-program property from property taxation. (In the *Malad* case, the farm's total production was turned over to the church. The question of business competition was presented in the second case.)