IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

TIVNU: BUILDING JUSTICE,　　　　　　）
　　　　　　　　　　　　　　　　　　）
　　　　　Plaintiff,　　　　　　　　　）　　TC-MD 150486R
　　　　　　　　　　　　　　　　　　）
　　　v.　　　　　　　　　　　　　　）
　　　　　　　　　　　　　　　　　　）
MULTNOMAH COUNTY ASSESSOR,　　　）
　　　　　　　　　　　　　　　　　　）
　　　　　Defendant.　　　　　　　　）　　**FINAL DECISION**[1]

Plaintiff appeals Defendant's denial of Plaintiff's application for exemption, dated

August 28, 2015, for the 2015-16 tax year.  Plaintiff timely appealed, each party moved for

summary judgment, and oral argument was held by telephone on April 28, 2016.  Plaintiff was

represented by Noah Barish, Attorney-at-Law, of McKanna Bishop Joffe, LLP.  Defendant was

represented by Carlos Rasch, Assistant County Attorney.  At the hearing the court invited the

parties to submit supplemental briefings on the impact of ORS 307.112(1)(b) to the facts of this

case.  Both parties timely submitted supplemental briefs.  The cross-motions for summary

judgment have been fully briefed and the matter is ready for decision.

## I.  STATEMENT OF FACTS

This case is before the court on the following stipulated facts:[2]

1. On or about June 18, 2015, Plaintiff Tivnu: Building Justice ("Tivnu") completed an

application for property tax exemption for the 2015-2016 tax year for the property located at

---

[1] This Final Decision incorporates without change the court's Decision, entered October 20, 2016.  The court did not receive a statement of costs and disbursements within 14 days after its Decision was entered.  *See* Tax Court Rule–Magistrate Division (TCR–MD) 16 C(1).

[2] The Statement of Facts reproduces the parties' Amended Stipulation of Facts, filed May 16, 2016.  Where indicated, some portions have been altered or omitted.

FINAL DECISION  TC-MD 150486R　　　　　　　　　　　　　　　　　　　　　　　　1

2226 NE 10th Ave, Portland, OR, 97212, which was received by the Multnomah County Assessor on or about July 1, 2015. [Ptf's Ex A.]

2. On or about August 28, 2015, Tivnu received a letter from Multnomah County, Oregon, Division of Assessment, Recording & Taxation denying Tivnu's application. The letter stated the reason for denial was: "The organization does not qualify in accordance with ORS 307.130 and/or ORS 307.140." [Ptf's Ex B.]

3. On or about November 19, 2015, Tivnu appealed Multnomah County's denial of its application for exemption by filing a complaint in the Magistrate Division of the Oregon Tax Court.

4. Tivnu is a nonprofit corporation organized for the public benefit in Oregon, and an Internal Revenue Code section 501(c)(3) corporation. [Ptf's Ex C.] According to its Articles of Incorporation, filed June 22, 2011 and amended November 2, 2012, Tivnu is organized "exclusively for charitable, religious, education, and scientific purposes." According to its Bylaws, Tivnu's specific objective and purpose is to "promote social justice through education, construction, and religious and cultural activities." [Ptf's Ex D, E.]

5. Tivnu creates educational programs that help youth engage in hands-on charitable activity in the Portland, Oregon area.

6. Tivnu does not operate for the profit or private advantage of its founders, directors, or officers.

7. The primary objectives of Tivnu is to engage Jewish and other youth in ensuring basic human needs (particularly housing) for low-income individuals, through direct service, Jewish education and observance, and creation of a residential Jewish community aimed at supporting those goals. [Ptf's Ex F.]

* * * * *

9.  Tivnu operates a number of programs, including single-day events, weeklong summer programs for high school students, and its signature 9-month Gap Year program for students aged 17-20.

10.  The Gap Year program consists of three main components:  1) hands-on community service work for other local charitable non-profits fighting homelessness and poverty; 2) communal living in a pluralistic Jewish environment; and 3) study of Jewish and secular texts related to social justice and community service.

11.  Gap Year participants spend approximately four and a half days per week engaged in volunteer hands-on community service work at various local non-profits engaged in fighting homelessness and poverty. * * *

12.  Gap Year participants engage in a variety of direct social service work at these organizations, including construction of affordable housing, tutoring at-risk youth, preparing and serving food for homeless individuals, staffing day shelters for homeless and emotionally disturbed individuals, and assisting with care of children at domestic violence shelters.

13.  If called to testify, Tivnu Executive Director Steve Eisenbach-Budner would state the following:

> * * * * *
>
> b.  To support Gap Year participants volunteering in the construction of affordable housing with Habitat for Humanity * * *, Tivnu provides a paid, professional construction trainer to increase the productivity of Gap Year participants on the building site, and increase the capacity of Habitat for Humanity building efforts.

14.  Neither Gap Year participants nor Tivnu received any remuneration for volunteer labor performed by Gap Year participants.

* * * * *

16.  The approximate cost for Tivnu to run each 9-month Gap Year program for eight participants is $35,000 per participant, or $280,000 overall.  This includes housing, food, training, volunteer placement and mentorship, educational programming, live-in residential assistant, professional construction trainer, field trips and retreats, and other associated services.

17.  If called to testify, Tivnu Executive Director Steve Eisenbach-Budner would state the following:

a.  Participant tuition does not nearly cover the actual cost of running the Gap Year program.  The remaining money is raised from private donors and charitable foundations.  Because of Tivnu's demonstrated contributions to local efforts to fight homelessness and poverty, Tivnu has received significant grants from the Oregon Community Foundation and the Meyer Memorial Trust, along with other grants from numerous charitable foundations on Jewish social service and social justice activities.

18.  In the 2015-2016 Gap Year program, each participant pays tuition of between $8,500 and $28,870.  In 2014-2015, Gap Year participants paid tuition ranging from $72 to $25,250. [Ptf's Ex G.]

19.  Tivnu provides tuition scholarships for the Gap Year program based on financial need.  No qualifying applicant is denied acceptance to the Gap Year program due to lack of funds.  Participants submit family financial information through a third-party assessment service used by many gap year and educational programs nationally.  Tivnu then awards scholarships

based on the individual financial need of each participant. In the 2015-2016 program, six of the eight participants received financial aid through this process, which included scholarships ranging from $1,800 to $20,370. In the 2014-2015 program, all nine of the participants received financial aid through this process, which included scholarships ranging from $1,250 to $26,428. [Ptf's Ex G.]

20. Tivnu leases a residential property located at 2226 NE 10th Ave, Portland, OR, 97212 ("the property"). The lease agreement was signed on or about June 3, 2015 for a lease commencing June 15, 2015 to June 29, 2016. Assessed property taxes for 2015 were $5,501.52. The property includes a house containing bedrooms, bathrooms, kitchen, and common living spaces. [Ptf's Ex H.] The lease agreement calls for monthly rent in the amount of $3,300.00 per month during the term of the lease. (*Id.*) Neither the lease agreement nor the accompanying addendum makes any reference to taxes, or below market rents based on any tax exemptions. There are no subsequent amendments or addendums to the lease agreement.

21. The owner of the property wrote and delivered to Tivnu an additional memorandum dated June 15, 2015, the same date the lease commenced. [Ptf's Ex J.] This document was not part of the lease agreement between Tivnu and the owner of the property. That memorandum indicated the amount being charged for the rental and occupancy of the property had been discounted to reflect the non-profit status of Tivnu. The memorandum also indicated that the lease between Tivnu and the owner had already taken into consideration the mutual agreement that "any and all Owner considerations received as a result (ie. Real Property Exemption) of this rental agreement will be passed to the lessee [Tivnu]." Tivnu provided a copy of this memorandum to the Multnomah County Assessor

when submitting its application for property tax exemption. At the time the County initially denied Tivnu's application for property tax exemption, it did not cite ORS 307.112 as a basis for denying Tivnu's application.

22. Tivnu took actual possession of the property on June 14, 2015, and has used and occupied it since that date.

23. Participants of Tivnu's Year Program live communally in the house, along with a paid residential adviser. Participants additionally use the house for committee meetings and social activities.

24. If called to testify, Tivnu Executive Director Steve Eisenbach-Budner would state the following:

   a. Without the property to serve as a residence for Gap Year participants, they would not be able to participate in the Gap Year program and provide the thousands of hours of volunteer services to Tivnu's partner charitable organizations.

25. Tivnu utilizes the property to conduct educational activities for the Gap Year program. These activities include study of religious and secular texts concerning social justice and charity.

26. Tivnu also use [*sic*] the property to store various materials necessary to running the Gap Year program. These tools include tools for construction of affordable house [*sic*] with Habitat for Humanity, camping supplies for program retreats, other program supplies, furniture, and kitchen implements.

27. Tivnu also utilizes the property as a place of religious worship and study. Gap Year participants and Tivnu staff engage in weekly Friday evening prayers and conduct Friday evening rituals associated with the traditional *Shabbat* meal. Gap Year participants and staff

engage in *Shabbat* (i.e. Sabbath) observance at the property from Friday night to Saturday night. Gap Year participants and Tivnu staff conduct holiday prayers and observances at the property, including those for *Sukkot*, *Hannukah*, and *Pesach*. Gap Year participants and Tivnu staff also engage in weekly religious text study at the property.

## II. ANALYSIS

The issues in this case are whether Plaintiff is a charitable or religious organization for purposes of ORS 307.130[3] or ORS 307.140, and if so, whether Plaintiff qualifies for a property tax exemption under ORS 307.112.

A.     *Burden of Proof and General Rules of Construction for Property Tax Exemption*

The burden of proof rests on the taxpayer to prove by a preponderance of the evidence that a claim for property tax exemption meets the statutory requirements. ORS 305.427; *Golden Writ of God v. Dept. of Rev.*, 300 Or 479, 483, 713 P2d 605 (1986). In resolving exemption controversies, the court is guided by the principle that "[t]axation is the rule and exemption from taxation is the exception." *Dove Lewis Mem. Emer. Vet. Clinic v. Dept. of Rev.* (*Dove Lewis*), 301 Or 423, 426, 723 P2d 320 (1986). Exemption statutes are strictly but reasonably construed. *German Apost. Christ. Church v. Dept. of Rev.* (*German Apost.*), 279 Or 637, 640, 569 P2d 596 (1977); *Washington County. v. Dept. of Rev.*, 11 OTR 251, 254 (1989). This court has ruled that "[s]trict but reasonable construction does not require the court to give the narrowest possible meaning to an exemption statute. Rather, it requires an exemption statute to be construed reasonably, giving due consideration to the ordinary meaning of the words of the statute and the legislative intent." *North Harbour Corp. v. Dept. of Rev.*, 16 OTR 91, 95 (2002).

/ / /

---

[3] The court's references to the Oregon Revised Statutes (ORS) are to 2015.

B.  *Exemption Under ORS 307.130*

ORS 307.130(2) exempts from taxation "property owned or being purchased" by a charitable organization that "is actually and exclusively occupied or used" in the organization's charitable work. Property that a taxable owner holds and leases to a charitable organization that is eligible for tax exemption under ORS 307.130 may be exempt from property taxation under ORS 307.112, provided that certain requirements are met.

The Oregon Supreme Court has interpreted ORS 307.130 to mean that a charitable organization seeking a property tax exemption must show that its "primary use of the property is reasonably necessary for the charitable functions of the [organization.]" *German Apost.*, 279 Or at 642. The "primary use" and "reasonably necessary" requirements are premised on the organization being a *charitable* organization; thus, there are three requirements for satisfying ORS 307.130: (1) the organization must be charitable; (2) its primary use of the property must be for the charitable functions of the organization; and (3) such primary use of the property must be reasonably necessary for those charitable functions. Accordingly, the court must first determine whether Tivnu is a charitable organization.

*1.  Charitable organization*

The Oregon Supreme Court has developed a three-prong test for analyzing the charitableness of an organization; *i.e.*, if all three prongs are satisfied, then the organization is a charitable organization for purposes of ORS 307.130: "(1) the organization must have charity as its primary, if not sole, object; (2) the organization must be performing in a manner that furthers its charitable object; and (3) the organization's performance must involve a gift or giving." *SW Oregon Pub. Def. Services v. Dept. of Rev.* (*SW Oregon*), 312 Or 82, 89 (1991); *see also*

OAR 150-307-0120.[4]  Both the Oregon Supreme Court and the Tax Court have held that the term "charitable," as used in ORS 307.130, also includes "the advancement of religion."  *House of Good Shepherd v. Dept. of Rev.*, 300 Or 340, 347 (1985); *Archdiocese of Portland v. Dept. of Rev.*, 5 OTR 111, 118–123 (1972), *aff'd* 266 Or 419, 513 P2d 1137 (1973); *Subud Portland v. Multnomah County. Assessor*, TC-MD 070621C, WL 242347 at *4 (Jan 28, 2009).

        a.      Charity as primary object

As to the first prong of the *SW Oregon* test, the Oregon Supreme Court has held that an organization's articles of incorporation and bylaws serve as prima facie evidence of the character of the organization.  *Dove Lewis*, 301 Or at 427.  Tivnu's articles of incorporations state that Tivnu "is organized exclusively for charitable, religious, educational, and scientific purposes[,]" and Tivnu's bylaws expressly state that its purpose is to "promote social justice through education, construction, and religious and cultural activities."  (Am Stip Facts at 1–2, ¶ 4.)  Tivnu is a nonprofit organization incorporated under Internal Revenue Code (IRC) section 501(c)(3) and "does not operate for the profit or private advantage of its founders, directors, or officers."  (*Id.* at ¶¶ 4, 6.)  Because Tivnu is a nonprofit organization and its articles of incorporation and bylaws sufficiently show that charity is Tivnu's primary object, Tivnu satisfies the first prong of the *SW Oregon* test.

        b.      Furthering the organization's charitable object

Though the articles of incorporation and bylaws support a conclusion that Tivnu has charity as its primary object, the court must determine "whether [Tivnu] is, by its conduct, charitable[.]" *Dove Lewis*, 301 Or at 428.  The Department of Revenue has promulgated a rule that succinctly summarizes the factors this court has considered in past decisions:

---

[4] The court's references to the Oregon Administrative Rules are to the 2016 version, which was renumbered as of September 1, 2016.

"The activity conducted by the charitable institution must be for the direct good or benefit of the public or community at large. Public benefits must be the primary purpose rather than a by-product. An organization that is established primarily for the benefit of its members, is not a qualifying charity."

OAR 150-307-0120(4)(b); *see also*, *Goodwill Indus. of Columbia Willamette, Inc. v. Benton County Assessor* (*Goodwill*), TC-MD 060676D, WL 1168679 at *4 (Apr 18, 2007); *The Enterprise for Employment & Education v. Marion County Assessor* (*Enterprise*), TC-MD 070841C, WL 36284750 at *2 (Oct 16, 2008); *We Care Oregon v. Washington County Assessor*, TC-MD 091226B, WL 4655319 at *5 (Nov 18, 2010).

Two of this court's prior decisions are helpful in applying the second prong of the *SW Oregon* test to the facts of the case at bar: *Enterprise* and *Grantmakers for Education v. Multnomah County. Assessor* (*Grantmakers*), TC-MD 021216E, WL 22119790 (Aug 21, 2003).

In *Grantmakers*, the plaintiff was a "nonprofit corporation organized to educate a network of philanthropic and charitable organizations about achieving greater efficiency in their giving to public education." *Grantmakers*, 2003 WL 22119790 at *1. The plaintiff neither worked directly with, nor gave directly to, the public education system; instead, *all* of its activities were directed at the participating foundations—and it was "the *foundations* that provided the 'charity' to the education system, not [the plaintiff]." *Id.* at *2 (emphasis in original). Moreover, though the plaintiff "assist[ed] the foundations in their decision making," it was entirely within the foundations' discretion as to "where and how to distribute their money." *Id.* Citing the requirement of OAR 150-307-0120-(4)(b) that the charitable activity "must be for the direct good or benefit of the public or community at large[,]" the court held that the plaintiff's activities were not charitable, because its focus was primarily on educating the participating foundations, which only indirectly impacted the community as a result. *Id.* at *2–3.

/ / /

This court applied *Grantmakers* to its analysis in *Enterprise* and sussed out a subtle distinction in interpreting the text of OAR 150-307-0120(4)(b): "[T]he distinction in the rule is not between direct and indirect benefit to the public, but whether the benefit provided is for the direct good or benefit of the public rather than primarily for the benefit of the organization's members * * *." *Enterprise*, 2001 WL 36284750 at *3. The plaintiff in *Enterprise* was a nonprofit organization that provided government funding to service providers that would, in turn, freely provide sundry employment services to individual members of the public. *Id.* at *1–2. In addition to providing funding, the plaintiff also "dicate[d] whom the service providers serve[d], how they serve[d] them, and then monitor[ed] their activities to ensure that the service providers achieve[d] a specific set of outcomes." *Id.* at *4.

The court held in *Enterprise* that the plaintiff satisfied the second prong because despite indirectly benefiting the public through intermediaries, *viz.*, the service providers, the plaintiff was not performing its activities primarily for the benefit of such intermediaries. Rather, the service providers were necessary for the accomplishment of the plaintiff's primary purpose of providing beneficial employment services to the public. *Id.*

The court understands Defendant's arguments to be that Plaintiff's work is not performed for the good of the public for two reasons: first, there are intermediary charities where the work is actually performed; second, the benefits are for the participants in the program—in the vernacular of Defendant's oral arguments, Plaintiff's signature program, "the Gap Year program," was little more than a summer camp.

Defendant's arguments are not persuasive. Although it is undisputed that students in the Gap Year program perform "hands-on community service work for other local charitable non-profits fighting homelessness and poverty" their actions are not to benefit the other charitable

organizations, but rather, to benefit individuals in the community in need of the assistance. (Am Stip Facts at 3, ¶ 10.) Similarly, although the participants may receive some benefit from the program, the primary objectives are to assist the community and foster charity in the individual participants as a lifelong worthy pursuant. Those objects appear to the Court as sufficiently charitable. As to Plaintiff's other primary goals "communal living in a pluralistic Jewish environment" and "study of Jewish and secular texts related to social justice and community service," Plaintiff accomplishes that through conducting "committee meetings and social activities[,]" studying "religious and secular texts concerning social justice and charity[,]" utilizing "the property as a place of religious worship and study[,]" and observing Sabbath and various Jewish holidays. (*Id.* at 6–7, ¶¶ 23, 25, 27.) Additionally the property is used to store "tools for construction of affordable house [*sic*] with Habitat for Humanity, camping supplies for program retreats, other program supplies, furniture, and kitchen implements." (*Id.* at 6, ¶ 26.)

Defendant focuses on the fact that the Gap Year participants pay tuition to partake in the program. But the tuition does not cover the approximate $35,000-per-participant cost of running the Gap Year program:

> "In the 2015-2016 Gap Year program, each participant pays [*sic*] tuition of between $8,500 and $28,870. In 2014-2015, Gap Year participants paid tuition ranging from $72 to $25,250.
>
> "Tivnu provides tuition scholarships for the Gap Year program based on financial need. No qualifying applicant is denied acceptance to the Gap Year program due to lack of funds. Participants submit family financial information through a third-party assessment service used by many gap year and educational programs nationally. Tivnu then awards scholarships based on the individual financial need of each participant. In the 2015-2016 program, six of the eight participants received financial aid through this process, which included scholarships ranging from $1,800 to $20,370. In the 2014-2015 program, all nine of the participants received financial aid through this process, which included scholarships ranging from $1,250 to $26,428."

(*Id.* at 4–5, ¶¶ 18–19.) The balance of the program costs are "raised from private donors and

charitable foundations[,]" according to Tivnu Executive Director Steve Eisenbach-Budner.  (*Id.* at 5, ¶ 17.)  Raising money from donations and even charging participants to recoup part of Plaintiff's costs does not defeat the gift giving element.  *SW Oregon*, 312 Or at 91.

In *Enterprise*, this court found that the plaintiff satisfied the second prong of *SW Oregon* because the plaintiff's work benefited the public, even though that was accomplished by providing funding and direction to the service providers.  Similarly, the court now finds that Tivnu satisfies the second prong because it accomplishes its charitable purpose by providing the necessary housing, sustenance, training, education, tools, funding via scholarship, and assistance to the participants—"service providers"—who demonstrably perform a substantial amount of charitable work alongside various nonprofit organizations.  Tivnu's significant level of involvement in the participants' volunteer activities notably differs from the plaintiffs in *Grantmakers* who were not involved whatsoever with the foundations' charitable work *vis-à-vis* the recipient public education system.

That conclusion is buttressed by the fact that the participants perform charitable work pursuant to several tenets of Judaism that Tivnu directly inculcates in the participants (Am Stip Facts at 2–3, ¶¶ 8, 10), which is to say that the work is performed as an advancement of religion, and in Oregon the advancement of religion is considered a form of charity "until the legislature indicates a different intention."  *House of Good Shepherd*, 300 Or at 347; *see also Archdiocese of Portland*, 5 OTR at 122; *Subud Portland*, 2009 WL 242347 at \*4.

    c.  Gift or giving

The third prong of *SW Oregon* requires an organization seeking a tax exemption to perform in a manner that involves "a gift or giving."  *SW Oregon*, 312 Or at 89; *see also* OAR 150-307-0120-(4)(d).  The *SW Oregon* court concluded that, when analyzing the "gift or

giving" requirement, it is proper to determine whether the donor had an expectation of remuneration from the recipient. *SW Oregon*, 312 Or at 92. That conclusion is consistent with paragraph (d) of the rule cited above: "This element of gift and giving is giving something of value to a recipient with no expectation of compensation or remuneration." OAR 150-307-0120(4)(d).

In *SW Oregon*, the plaintiff taxpayer was a nonprofit organization "whose sole activity [was] providing legal services to indigent clients * * * pursuant to a contract with the State Court Administrator." *SW Oregon*, 312 Or at 84. The plaintiff received "its funding solely from the state * * *." *Id.* Moreover, despite the fact that the "indigent clients [did] not pay any fees to taxpayer but [would], if able, repay the state for all or a portion of the costs for their court-appointed attorneys[,] [t]axpayer receive[d] no part of any such repayment." *Id.* The Department of Revenue argued that, because the plaintiff received funding from the state through a services contract, that contract "create[d] in taxpayer an expectation of compensation or remuneration that prevent[ed] taxpayer's activities from qualifying as 'giving' * * *." *Id.* at 88.

The court disagreed with that conclusion and first determined that it is "incorrect" to interpret "the rule by viewing any alleged 'giving' from the perspective of the taxpayer." *Id.* at 91. The court elaborated further in stating, "the question becomes, not whether taxpayer gains some kind of remuneration from some source, but whether, *so far as the recipient is concerned*, the taxpayer's services are given to the recipients with strings attached." *Id.* at 91–92. (Emphasis in original.) The court concluded:

> "It is clear from a close reading of the regulation that paragraph (d) refers to 'an expectation of compensation or remuneration' from the recipients of the charity * * *. Because taxpayer renders its services to its indigent clients without

> / / /

an expectation of compensation or remuneration from them, taxpayer satisfies [the regulation]."

*Id.* at 92.

In this case, Tivnu places its Gap Year program participants with various nonprofit organizations to carry out charitable work for low-income individuals—the recipients. (Am Stip Facts at 3, ¶¶ 10–12.) The parties have stipulated that neither the participants nor Tivnu have received any remuneration from any source for the work performed. (*Id.* at 4, ¶ 14.)

Not only are the activities of its participants frequently stipulated as being "volunteer community services" or some variation thereof, Tivnu "does not operate for the profit or private advantage of its founders, directors, or officers." (*Id.* at 2, ¶ 6.) As noted above in the second-prong analysis, the participants pay tuition to take part in the Gap Year program, but the tuition is heavily subsidized by private donors and charitable organizations to cover the balance of the costs of running the program and to ensure that "[n]o qualifying applicant is denied acceptance to the Gap Year program due to lack of funds." (*Id.* at 5, ¶¶ 17, 19.) Thus, it is inconsequential that Tivnu receives any money at all, because none of that money is received from the low-income individuals served by its participants. "*[S]o far as the recipient is concerned*, [Tivnu's] services are given to the recipients with [no] strings attached." *SW Oregon*, 312 Or at 91–92 (emphasis in original).

The court concludes that Tivnu's activities involve "a gift or giving" because it does not appear to expect any remuneration for the charitable services it provides, through its participants, to the recipient low-income individuals. Because Tivnu satisfies all three prongs of the *SW Oregon* charitable organization test, Tivnu is accordingly deemed a charitable organization for purposes of ORS 307.130.

/ / /

2.    *Primary use*

Having determined that Tivnu is a charitable organization for purposes of ORS 307.130, the court now addresses whether "the primary use of the property is reasonably necessary for the charitable functions of the taxpayer." *German Apost.*, 279 Or at 642.  A challenging aspect of this case is that Tivnu's use of the property does not meet the traditionally defined uses of religious or charitable; its plan is more of a synthesis of the two.  Tivnu intertwines its charitable work with education and religious components, all supporting the other.  While it is true that Tivnu uses the property as a residence, under *Multnomah School of the Bible v. Multnomah County*, 218 OR 19, 343 P2d 893 (1959), that fact alone does not end the analysis.  Since the oral argument in this case, the Supreme Court issued its opinion in *Habitat for Humanity of the Mid-Willamette Valley v. Dept. of Rev.* (*Habitat*), 356 Or 257, __ P3d __, (September 15, 2016).  In *Habitat* the Supreme Court considered whether a vacant lot could be property used for a charitable purpose.  The Supreme Court distinguished the prior case of *Emanuel Lutheran Charity Board v. Department of Rev*enue (*Emanuel Lutheran)*, 263 Or 287, 502 P2d 251 (1972), where the court held that "land merely being held for future use is not being actually occupied or used or the benevolent or charitable work carried on by [the hospital]." *Habitat* 356 Or at 264. The court rejected that *Emanuel Lutheran* established a bright-line rule, and instead reviewed the property's use in context of the organization's chartable purpose. *See id.*  The court found that "Habitat's charitable work *is* the acquisition and development of land[,] * * * [and thus] Habitat directly performs its charitable works when it acquires and develops property." *Id*. at 266 (emphasis in original).  In the case before this court, Tivnu's charitable mission uses an integrative approach of assignments to various charities, group discussions over dinner, and discussions of the ethics and religious obligations of charity during the Sabbath.  The court

rejects Defendant's arguments that the Property was primarily used as a dwelling. Using the Supreme Court's more nuanced and less doctrinaire approach, it is the opinion of this court that in light of its integrative approach to charity, as well as its primary purpose, the property was actually and exclusively used in charitable work by Tivnu.

The parties have stipulated that Tivnu uses the subject property "as a place of religious worship and study." (Am Stip Facts at 7, ¶ 27.) As mentioned above, the latter two of the three components of the Gap Year program are "communal living in a pluralistic Jewish environment" and the "study of Jewish and secular texts related to social justice and community service." (*Id.* at 3, ¶ 10.) Pursuant to Tivnu implementing those components, the parties have stipulated that the Gap Year participants "live communally in the house, * * * use the house for committee meetings and social activities[,] * * * [and study] religious and secular texts concerning social justice and charity." (*Id.* at 6, ¶¶ 23, 25.) The participants and Tivnu staff also "engage in weekly Friday evening prayers and conduct Friday evening rituals associated with the traditional *Shabbat* meal[, and] * * * engage in weekly religious text study at the property." (*Id.* at 7, ¶ 27.) The participants and staff likewise conduct other religious activities at the subject property such as observing several Jewish holidays. (*Id.*)

In at least one case evaluating whether the amount of use at issue rose to the level of "primary use," this court calculated the percentage of time devoted to the religious or charitable use of the property for which exemption was sought. *See Subud Portland*, 2009 WL 242347 at *5 (noting that 68 percent would likely be sufficient to qualify as "primary"). More importantly though, the Oregon Supreme Court noted in *Multnomah School of the Bible* that, "while adhering to the rule of strict construction when construing tax exemption statutes, the courts, in trying to

/ / /

capture the meaning of 'exclusively used' and kindred phrases, travel a road distinguished for its appreciation of common sense and reason." 218 Or at 33.

Thus, although the facts of this case do not easily translate into a percentage of time during which the property is used for religious or charitable purposes, this court is satisfied through "its appreciation of common sense and reason" that the aforementioned activities preponderantly establish that the primary use of the subject property is for the advancement of both religion and charity.[5]  Accordingly, this court finds that the primary use of the property is for Tivnu's charitable functions.

3.      *Reasonably necessary*

The next issue is whether the property is reasonably necessary to accomplish those charitable functions.  The very nature of the Gap Year program is such that its participants must live communally for nine months at the subject property, where they perform religious and social activities predominantly consistent with Judaism.  (*See* Am Stip Facts at 3–4, ¶¶ 10, 16.)  The subject property doubly serves as a home base from which the participants disperse into the world to perform community service in accordance with their study of "Jewish and secular texts related to social justice and community service."  (*Id.* at 3, ¶ 10.)  The participants are making a nine-month commitment to engage in these religious and charitable activities, and therefore they *must* reside *somewhere together*.  The subject property is that particular *somewhere*.  Thus, the property is reasonably necessary for Tivnu to accomplish its goals of engaging "Jewish and other youth in ensuring basic human needs (particularly housing) for low-income individuals, through direct service, Jewish education and observance, and creation of a residential Jewish community aimed at supporting those goals."  (*Id.* at 2, ¶ 7.)

---

[5] The incidental "storage" uses of the property do not appear to be for profit, but rather seem reasonably necessary for the accomplishment of the charitable activities of performing community service.

Because Tivnu is a charitable institution and the primary use of the subject property is reasonably necessary to carry out Tivnu's charitable functions, the court finds that Tivnu qualifies for a property tax exemption under ORS 307.130. In light of the court's conclusion, the court finds it unnecessary to determine whether Tivnu qualifies for an exemption under ORS 307.140.

C.      *Property Tax Exemption as Lessee under ORS 307.112*

Having determined that Tivnu generally qualifies for a property tax exemption under ORS 307.130, the issue now is whether Tivnu specifically qualifies for a property tax exemption for the subject property under ORS 307.112 for the 2015-16 tax year.

ORS 307.112 grants a property tax exemption for property owned by a "taxable owner" that is leased to an organization entitled to exemption under, *inter alia*, ORS 307.130. To obtain the exemption of ORS 307.112, the organization seeking the exemption must show that:

> "(a) The property is used by the lessee * * * in the manner, if any, required by law for the exemption of property owned, leased, subleased or being purchased by it; and
>
> "(b) It is expressly agreed within the lease * * * that the rent payable by the * * * organization * * * has been established to reflect the savings below market rent resulting from the exemption from taxation."

ORS 307.112(1)(a)–(b). The following condition is imposed upon the sufficiency of the organization's claim for exemption:

> "(3) If the assessor is not satisfied that the rent stated in the lease * * * has been established to reflect the savings below market rent resulting from the tax exemption, before the exemption may be granted the lessor must provide documentary proof, as specified by rule of the Department of Revenue, that the rent has been established to reflect the savings below market rent resulting from the tax exemption."

ORS 307.112(3).

/ / /

As referenced in subsection (3), the Department of Revenue has promulgated rules to aid the assessor in determining the sufficiency of the organization's claim for exemption, and the most pertinent of said rules are as follows:

> "(5) The assessor must be satisfied that the amount of rent charged is below market rent. 'Market rent' is defined as the rental income a property would most probably command in the open market and includes an element for property taxes.
>
> "(6) To reflect the savings below market rent, the actual rent must be less than market rent in an amount that is at least equal to what the property tax would be if the property were taxable.
>
> "(7) Sufficient documentary proof must be submitted at the time of application.
>
> "(8) Acceptable documentary proof to show the property tax savings is passed on to the lessee may include but is not limited to the following comparisons:
>
>> "(a) Current rental rate for any portion of that property occupied by nonexempt tenants;
>>
>> "(b) Historic rental rate data of that property;
>>
>> "(c) Rental rate used in a real market value appraisal for that property;
>>
>> "(d) Rent study of comparable or similar properties.
>
> "(9) The savings must be clearly evident. Insufficient proof or failure to show the rent is below market rent as described above is grounds for denial of the exemption.
>
> "(10) A statement that the 'lessee is responsible for the taxes' is not sufficient proof of a tax savings."

OAR 150-307-0060.

The foregoing statute and rule are quite transparent in their requirements for express and clear language to be in the lease that states the parties' intent to allocate the benefit of property tax exemption to the lessee. In the case at bar, the lease undoubtedly fails paragraph (b) of ORS 307.112(1)—it is *not* expressly agreed *in* the lease that Tivnu's rent "has been established to reflect the savings below market rent resulting from the exemption from taxation." It is

furthermore clear that Tivnu did not satisfy any of the documentation standards provided in paragraphs (8), (9), or (10) of the rule; regarding the rent, the lease simply states the monthly rent as being $3,300 per month without even a hint of a discount for tax exemption. Finally, the parties have stipulated that "[n]either the lease agreement or the accompanying addendum make any reference to taxes, or below market rents based on any tax exemptions. There are no subsequent amendments or addendums to the lease agreement." (Am Stip Facts at 5, ¶ 20.) The only document that attests to the parties' intent to discount the rent is the landlord's memorandum dated June 15, 2015, which is the same day the lease commenced. (Ptf's Ex J; Am Stip Facts at 6, ¶ 21.) That memorandum states the following, in relevant part:

> "The amount being charged for the rental and occupancy of the property at the above address has been discounted to reflect the non-profit status of the Tivnu Building Justice organization. It is our agreement that any and all Owner considerations received as a result (ie. Real Property Exemption) of this rental agreement will be passed to the lessee. This has already been taken into consideration with the agreement signed on June 3, 2015 for the lease commencing June 15th 2015 to June 29th 2016."

(Ptf's Ex J.) Notwithstanding the evidentiary issue of parol evidence and the fact that the lease is deemed integrated by its own terms, (Ptf's Ex H, ¶ 31), the court finds dispositive the fact that the memorandum does not provide any of the listed acceptable forms of documentary proof described in paragraph (8) of the rule: The memorandum does not state any "(a) [c]urrent rental rate for any portion of that property occupied by nonexempt tenants; (b) [h]istoric rental rate data of that property; (c) [r]ental rate used in a real market value appraisal for that property; (d) [r]ent study of comparable or similar properties." OAR 150-307-0060(8). The savings are *not* clearly evident, as otherwise required by paragraph (9). Because Tivnu has failed to satisfy the requirements of ORS 307.112(1)(b) and OAR 150-307-0060, the court finds that Tivnu's claimed property tax exemption for the 2015-16 tax year was properly denied.

III.  CONCLUSION

The court concludes that Plaintiff is a charitable organization for purposes of

ORS 307.130.  The court also concludes that Plaintiff's primary use of the subject property is

religious and charitable, and that such use is reasonably necessary for Plaintiff's religious and

charitable functions.  Therefore, Plaintiff is potentially eligible for property tax exemption under

ORS 307.130.  However, the court concludes that Plaintiff satisfied neither the statutory

requirements of ORS 307.112 nor the regulatory requirements of OAR 150-307-0060 and is

therefore properly denied the claimed property tax exemption for the 2015-16 tax year.  Now,

therefore,

IT IS THE DECISION OF THIS COURT that Plaintiff's Motion for Summary Judgment

is denied; and

IT IS FURTHER DECIDED that Defendant's Cross-Motion for Summary Judgment is

granted.

Dated this ___ day of November 2016.


_____
RICHARD DAVIS
MAGISTRATE

*If you want to appeal this Final Decision, file a complaint in the Regular
Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR
97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your complaint must be submitted within <u>60</u> days after the date of the Final
Decision or this Final Decision cannot be changed.  TCR-MD 19 B.*

*This document was filed and entered on November 15, 2016.*