512  November 26, 2019  No. 23

IN THE OREGON TAX COURT
REGULAR DIVISION

DEPARTMENT OF REVENUE,
*Plaintiff,*
*and*

WASHINGTON COUNTY ASSESSOR,
*Intervenor-Plaintiff,*

*v.*

THE NEW FRIENDS OF
THE BEAVERTON CITY LIBRARY,
*Defendant.*

(TC 5311)

Intervenor (the county) denied Defendant's (taxpayer) property tax exemption for the subject property, which Defendant primarily used to operate a used bookstore. Defendant appealed to the Magistrate Division, which decided in Defendant's favor. Plaintiff (the department) appealed to the Regular Division. On Defendant's motion for summary judgment, the court held that, although Defendant is a charitable institution because its primary purpose is to donate time and resources to the Beaverton City Library, the subject property is not entitled to exemption under ORS 307.130(2)(a) because Defendant's use of the property is primarily operating a retail establishment at market prices. Longstanding case law prohibits treating that operation as a charitable *use* despite Defendant's charitable *purpose*. The court further held that Defendant is not a "literary institution."

Oral argument on Defendant's Motion for Summary Judgment was held December 4, 2018, in the courtroom of the Oregon Tax Court, Salem.

Darren Weirnick, Senior Assistant Attorney General, Department of Justice, Salem, filed a response and argued the cause for Plaintiff (the department).

Brad Anderson, Washington County Counsel, filed a response and argued the cause for Plaintiff-Intervenor (the county).

Ivan R. Gutierrez, Miller Nash Graham & Dunn LLP, Portland, filed the motion and argued the cause for Defendant (taxpayer).

Decision for Plaintiff and Intervenor rendered November 26, 2019.

## ROBERT T. MANICKE, Judge.

### I. INTRODUCTION

For the property tax year 2016-17, the Washington County Assessor (the county) denied an application for exemption filed by Defendant, The New Friends of the Beaverton City Library (taxpayer) for a lot and buildings at which taxpayer conducts operations, including sales of used books. The county's stated ground was that the property was "primarily used for the generation of income/fundraising for a charitable institution * * * [p]er OAR 150-307.130-(A)(5)(a)."

Taxpayer timely appealed to the Magistrate Division, which decided in taxpayer's favor, concluding that taxpayer's operation of a bookstore was a use qualifying the property for tax exemption[1] under ORS 307.130(2).[2] Plaintiff Department of Revenue (the department) timely appealed as the plaintiff by operation of law in this division of the court, and the county joined as Plaintiff-Intervenor. *See* ORS 305.501(1). Taxpayer moves for summary judgment on the substantive claim that it is a charitable or literary institution, and that its use of the subject property entitles the property to exemption under ORS 307.130(2). The department and the county join in opposing taxpayer's motion.[3]

### II. FACTS

The following facts are not in dispute and, unless otherwise indicated, applied at all relevant times. Taxpayer is an Oregon nonprofit corporation and is exempt from federal income tax under section 501(c)(3) of the Internal Revenue Code. *See* ORS 65.001(29); IRC § 501(c)(3). Taxpayer's bylaws state that its mission is to (1) "Support and strengthen" the Beaverton City Library; (2) "Cooperate with the library in expanding the library services for the

---

[1] The magistrate concluded that the county agreed that taxpayer was a charitable institution, a point that the Department of Revenue as plaintiff in this *de novo* appeal disputes.

[2] The court's references to the Oregon Revised Statutes (ORS) are to the 2015 edition.

[3] From this point, references to the department include the county unless otherwise indicated.

community"; (3) "Create an appreciation of library services"; and (4) "Promote the development of library programs." The bylaws also state that taxpayer "will accomplish this mission by acquiring and selling books, as well as audio visual materials in various formats and levels of ability." The Beaverton City Library (the Library) is part of, and is operated by the City of Beaverton, a municipal corporation.

The subject property is located at 12470 SW 5th Street, Beaverton, OR 97005, essentially across the street from the Library and a large public park. It includes a two-story former residence with a total interior area of 1,812 square feet on an approximately 2,430 square foot lot with exterior landscaping, access ways, and areas for parking. A sign in the front yard, shaped like three large hardcover books, reads: "Book Corner Used Books." Taxpayer's website shows that an open space on the first floor is lined with bookshelves to a height of approximately six feet and otherwise holds a long table full of books in the middle of the room, an office desk and chair, a fireplace, and two large windows. A back room is used for sorting, pricing and temporary storage of inventory, and upstairs space is used to process online sales. Taxpayer leases the subject property from the City of Beaverton at a rate that the parties agree is below market for purposes of ORS 307.166(1).

Taxpayer operates under the name "The Book Corner." In 2015 and 2016 taxpayer offered for sale and sold to the public at the subject property used books donated by the public and used books the Library removed from circulation, as well as CDs and DVDs. During 2015 and through the end of July 2016, taxpayer also sold used books and other materials to the public through Amazon at the subject property. During 2015 and through the end of October 2016, taxpayer employed two part-time employees at the subject property to manage in-store and online sales. All other activities at the subject property were undertaken by volunteers, members of taxpayer's board of directors, or the public. For tax years 2015 through 2017, taxpayer gave a total of $49,455 to the Library.

The court will discuss additional facts where appropriate.

## III.   ISSUES

(1)   Is taxpayer a charitable institution within the meaning of ORS 307.130(2)?

(2)   If taxpayer is a charitable institution, does taxpayer's use of the subject property entitle the property to exemption?

(3)   Alternatively, is taxpayer a literary institution within the meaning of ORS 307.130(2)?

(4)   If taxpayer is a literary institution, does taxpayer's use of the subject property entitle the property to exemption?

## IV.   ANALYSIS

A.   *Summary Judgment Standard*

The court grants a motion for summary judgment only if "the pleadings *** declarations, and admissions on file show that there is no genuine issue as to any material fact and that the moving party is entitled to prevail as a matter of law." Tax Court Rule (TCR) 47 C. *See Christensen II v. Dept. of Rev.*, 23 OTR 155, 162-63 (2018) (citing *Two Two v. Fujitech America, Inc.*, 355 Or 319, 331, 325 P3d 707 (2014)). "No genuine issue as to a material fact exists if, based upon the record before the court viewed in a manner most favorable to the adverse party, no objectively reasonable [factfinder] could [find] for the adverse party on the matter that is the subject of the motion for summary judgment." TCR 47 C. The adverse party has the burden of producing evidence on any issue raised in the motions as to which the adverse party would have the burden of persuasion at trial. *Id.* As applied to this case, this standard means that taxpayer as the party moving for summary judgment must point to facts in the record that prove taxpayer's right to the exemption such that no reasonable factfinder could find in favor of the department, even though the court must view the record in a manner most favorable to the department.

B.  *Legal Framework and Taxpayer's Factual Assumption
    for Purposes of Its Motion*

Oregon law provides a property tax exemption for properties owned by or leased to certain organizations.[4] ORS 307.130(2) reads, in pertinent part:

> "* * * [T]he following property owned or being purchased by * * * incorporated *literary, benevolent, charitable and scientific institutions* shall be exempt from taxation.
>
> "(a) * * * [O]nly such real or personal property, or proportion thereof, as is actually and exclusively *occupied or used* in the literary, benevolent, charitable or scientific work carried on by such institutions."

(Emphasis added.) The court views the statute as imposing two sets of requirements, which the court refers to here as the "entity-level" requirements contained in the flush language of subsection (2), and the "property use" requirements contained in paragraph (2)(a). The entity-level requirements differ, depending on whether the organization seeks exemption as a charitable,[5] literary, or scientific institution. Claims of exemption on the basis that the taxpayer is a "charitable" institution using the property in its "charitable work" are common and are governed by an extensive body of Oregon Supreme Court decisions that this court, as a lower court, is bound to follow. *See Re v. PERS*, 256 Or App 52, 54, 301 P3d 932, *rev den*, 353 Or 867 (2013) ("It is not this court's role to overrule, directly or indirectly, Supreme Court case law."); *State v. Turner*, 235 Or App 462, 466, 234 P3d 993 (2010) (declining state's invitation to cease treating venue as a material allegation that must be proved beyond a reasonable doubt "because we remain bound by Supreme Court precedent until such time as that court reconsiders and disavows it"). Regarding the use requirement, courts have long required the use to be "primarily," rather than literally "exclusively," dedicated to the exempt work.

---

[4] ORS 307.166 imposes additional requirements for properties leased from one organization whose property is eligible for exemption to another. In this case, neither the department nor the county challenges exemption on the basis of any such additional requirement.

[5] As used in ORS 307.130(2)(a), the word "benevolent" means charitable. *See Behnke-Walker v. Multnomah County*, 173 Or 510, 519, 146 P2d 614 (1944).

*E.g.*, *Mult. School of Bible v. Mult. Co.*, 218 Or 19, 31, 343 P2d 893 (1959). Taxpayer first argues that it fulfills the entity-level requirements as a charitable institution and that it fulfills the use requirements by primarily using the subject property to carry on its charitable work of supporting the Library and advancing literacy. Alternatively, taxpayer contends that it is a "literary institution" primarily using the subject property to further its literary objectives, a claim governed by fewer Supreme Court decisions.[6] In contrast to the Magistrate Division proceedings, where the county appears to have agreed that taxpayer satisfies the entity-level requirements, the department now challenges taxpayer's status as a charitable or literary institution, and in either event it contends that taxpayer does not satisfy the property use requirements. Solely for purposes of its motion, taxpayer asks the court to assume that it charged market rate prices for its inventory.

C.   *Is taxpayer a charitable institution?*

To satisfy the entity-level requirements for a charitable institution under ORS 307.130(2): "(1) the organization must have charity as its primary, if not sole, object; (2) the organization must be performing in a manner that furthers its charitable object; and (3) the organization's performance must involve a gift or giving." *SW Oregon Pub. Def. Services v. Dept. of Rev.*, 312 Or 82, 89, 817 P2d 1292 (1991) (citing *Dove Lewis Mem. Emer. Vet. Clinic v. Dept. of Rev.*, 301 Or 423, 428, 723 P2d 320 (1986), and *former* OAR 150-301.130-(A)[7]. Taxpayer contends that it satisfies all three requirements. The department acknowledges that taxpayer has articulated a charitable purpose of supporting the Library, and that taxpayer devotes some of its efforts to performing in a manner that supports that object, but the department contends that the retail sale of books at market prices to raise money is, or has become, taxpayer's true primary purpose and is inherently not charitable.

---

[6] Taxpayer does not argue that it is a scientific institution within the meaning of ORS 307.130(2).

[7] This administrative rule has since been renumbered to OAR 150-307-0120.

As to the first requirement, taxpayer's bylaws provide:

"The mission of New Friends of the Beaverton City Library is to:

"• Support and strengthen the library

"• Cooperate with the library in expanding library services for the community

"• Create an appreciation of library services

"• Promote the development of library programs

"[Taxpayer] will accomplish this mission by acquiring and selling books as well as audio and visual materials in various formats and levels of ability."

This mission statement articulates an "object" that is inherently charitable—supporting the Library's services and programs and promoting the Library. Taxpayer unquestionably does maintain this object. And as the discussion below will show, the court concludes that supporting the Library remains taxpayer's "primary" object despite inferences that the department draws from the uncontested factual record. The court concludes that taxpayer satisfies the first entity-level requirement.

The second requirement tests whether the organization acts in a manner that furthers its charitable object. In many cases the issue is whether the organization has a sufficiently high level of activity overall, or whether the organization acts in ways that benefit members or other insiders instead of focusing on its charitable mission. *See, e.g.*, *Dove Lewis*, 301 Or at 429 (finding taxpayer veterinary clinic's referral process generated a private advantage to taxpayer's founders). Here, too, the department essentially argues that the activity of running the bookstore is, or recently has become, taxpayer's main reason for being and has eclipsed the purpose of supporting the Library. As with the first requirement, the court finds that the evidence is sufficient to sustain taxpayer's position on summary judgment; the court will discuss the reasons for its conclusion below, in the course of addressing the department's primary argument based on an alleged lack of "gift or giving." Moreover, at least in this case, the court concludes that accepting the department's argument would convert the charitable activity requirement into a recapitulation of the "property use"

test, which has its own separate function that is defined by different case law. The court is not aware of precedent that would brand an organization as not a charitable institution simply because it sells goods or services as the means to pursue its charitable object. The court concludes that taxpayer satisfies the second entity-level requirement.

Regarding the final entity-level requirement, in cases involving organizations that charge for goods or services, the Oregon Supreme Court has identified the following factors as particularly probative of "gift or giving":

> "(1) Whether the receipts are applied to the upkeep, maintenance and equipment of the institution or are otherwise employed;
>
> "(2) Whether patients or patrons receive the same treatment irrespective of their ability to pay;
>
> "(3) Whether the doors are open to rich and poor alike and without discrimination as to race, color or creed;
>
> "(4) Whether charges are made to all customers and, if made, are lesser charges made to the poor or are any charges made to the indigent."

*SW Oregon Pub. Def. Services v. Dept. of Rev.*, 312 Or 82, 92, (1991) (quoting OAR 150-307-0120(4)(d)(C) (emphases omitted)). None of the factors are required, nor is the list exhaustive. *Methodist Homes, Inc. v. Tax Com.*, 226 Or 298, 309-10, 360 P2d 293 (1961); *see also Serenity Lane, Inc. v. Lane County Assessor*, 21 OTR 229, 236 (2013); *Hazelden Foundation v. Yamhill County Assessor*, 21 OTR 245, 250 (2013).[8]

---

[8] In *Hazelden Foundation* (which should be read together with *Serenity Lane*), this court rejected the taxpayer's "quantitative approach" as to whether the organization was charitable, which relied on an incorrect reading of *YMCA v. Dept. of Rev.*, 308 Or 644, 784 P2d 1086 (1989) (*YMCA II*). In *YMCA II*, the Supreme Court found insufficient "gift or giving" in the operations of two fitness centers that offered "scholarship giving" amounting to "less than four percent" of the organization's total annual revenue. 21 OTR at 250-51 (citing *YMCA II*, 308 Or at 653-54). In *Hazelden Foundation*, this court rejected the taxpayer's argument "that the 'gift or giving' requirement is met simply because taxpayer's patient aid *exceeds* four percent of annual revenues and more than eight percent of taxpayer's patients receive such aid." 21 OTR at 251 (emphasis added). This court instead approved taxpayer's "qualitative approach," which relied on the qualitative criteria adopted by the Supreme Court in *SW Oregon*, 312 Or at 82 (quoting OAR 150-307.130-A(4)(d)(C)), as "more in keeping with the cases of this court and of the Supreme Court on the subject of exemption for charitable institutions." *Hazelden Foundation*, 21 OTR at 251.

The first of the four "gift or giving" factors functions mainly to sift out institutions whose activities inure to the benefit of those who organize or run it. *See Hazelden Foundation,* 21 OTR at 252. The department alleges no such private advantage here, and the court finds none. The remaining three factors focus on the extent to which a taxpayer ensures that the poor[9] have access to the products or services that the taxpayer sells. In this case, taxpayer identifies four activities that it contends prove the element of gift or giving: its gifts of books to other organizations, its cash and in-kind gifts to the Library, its use of volunteers and its special sale pricing.

The court first turns to taxpayer's cash gifts to the Library. A review of taxpayer's most recent federal income tax returns[10] in the record, for calendar years 2015 and 2016, shows that taxpayer donated cash amounts to the Library that the department acknowledges are "not insignificant": $15,125 in 2015 and $18,174 in 2016. In each year, these cash donations comprised the majority of taxpayer's net income after all expenses,[11] which consist of typical items such as rent and total wages of about $33,000 for the two part-time employees who managed the sales and the volunteers. Solely to put these amounts in perspective, the court notes that taxpayer's respective total receipts for each year (before any reduction for cost of goods sold) were $86,170 and $97,011, meaning that taxpayer gave the Library about 18 percent of its total receipts for each year.[12] In consultation

---

[9] The department raises, and the court sees, no issue regarding unfair treatment of other disadvantaged groups.

[10] Like most nonreligious exempt organizations of even modest size, taxpayer was required to file, under penalty of perjury, annual "information" returns with the Internal Revenue Service on Form 990 reporting detailed information about its receipts, expenditures, and governance.

[11] The court emphasizes that its discussion of quantitative evidence, whether expressed as absolute dollar amounts, percentages of revenues, number of volunteers, or volunteer hours, does not set a threshold or safe harbor for any other case. *See Hazelden*, 21 OTR at 251 (emphasizing qualitative approach in lieu of taxpayer's proffered test).

[12] The department contends that taxpayer more recently has been reducing its donations to the Library while simultaneously growing its cash reserves, apparently implying that the reserves exceed taxpayer's reasonable needs, or that the level of taxpayer's giving to the Library has become inconsistent with taxpayer's stated purpose. But the department offers as evidence only the treasurer's one-page "Annual Report" through September 30, 2017. The Annual Report does

with taxpayer, the Library used the donated funds to pay for an annual "wish list" of items outside the Library's normal budget, such as furniture for new Library branches, books, marketing efforts, and Library staff appreciation events. The court finds that taxpayer's cash gifts to the Library are strong evidence of an element of "gift or giving."

Taxpayer also received donations of books, sorted them, and transferred to others those books it decided not to sell at retail.[13] The detailed evidence of this activity paints a mixed picture that does, as the department argues, appear to change over time. Taxpayer points out that, in 2015, taxpayer transferred 1,287 boxes of books that it did not sell at retail. Of these, about 53 percent went to the Salvation Army and 19 percent to a Rotary chapter.[14,15] About 21 percent went to a for-profit company (Better World Books), which paid taxpayer for the books, and the remaining 7 percent went to four organizations or schools, including Children's Book Bank, Cranes of Hope, Operation Paperback, and the Vose School.  On the other hand, the department points out that, during the first six months of 2016, taxpayer increased its share of transfers to for-profit entities from 21 percent to 43 percent, and late in that period (in May 2016), taxpayer decided to cease all transfers to the Salvation Army, in favor of a for-profit company, Discover Books, which not only paid taxpayer for the books but picked them up from taxpayer's location without requiring taxpayer to first box them up. As the Salvation Army had been by far taxpayer's largest charitable transferee, receiving 68 percent of taxpayer's

---

not contradict the tax returns because its 12-month period does not align with the calendar year that taxpayer used for income tax reporting purposes, and the Annual Report uses undefined expense categories that do not appear to correspond to the line items in the federal tax return. The Annual Report thus is inadequate as evidence that taxpayer reduced its giving to the Library, nor does the Annual Report provide enough context about taxpayer's use of funds to create a question of material fact about whether the required element of gift or giving was lacking.

[13] Over three-quarters of the books taxpayer accepted during 2016 were donated by the general public; the remainder was from the Library.

[14] Taxpayer seems to assume that the Salvation Army and the Rotary chapter are charitable organizations, at least in a general sense, and the department does not dispute that assumption.

[15] The court notes that the exhibit contains an arithmetic error; the totals do not reflect transfers made in December 2015.

transfers to charities and 39 percent of all transfers during the first half of 2016, taxpayer's decision implies a dramatic shift, from giving away most of its nonretail inventory to charities toward essentially selling most of it at wholesale to for-profit distributors. The court hesitates to declare a trend from such a limited data set, but the court concludes that the evidence from the first half of 2016 seriously weakens taxpayer's claim that its donations of books to charitable causes constituted evidence of an element of "gift or giving."

Taxpayer also cites its use of its employees and volunteers to provide in-kind services to the Library as evidence of the element of "gift or giving." Taxpayer appears to refer to the service of removing older books from circulation at the Library to make room for new ones. The court agrees that this service is of some value to the Library, and the use of staff and volunteers to perform this service is some evidence of "gift or giving," although not conclusive by itself. *See Salem Non-Profit Housing, Inc. v. Dept. of Rev.*, 9 OTR 265, 268 (1982) ("The fact that dedicated members of plaintiff's board of directors have unselfishly contributed hundreds of unpaid hours to the creation and administration of a highly commendable project does not make the operation charitable per se."); OAR 150-307-0120(4)(d)(D) (stating rule).[16]

The court finds nothing in taxpayer's special sale pricing that supports its position as to the element of "gift or giving," given the assumption that all pricing is at market.

In sum, the evidence of an element of "gift or giving" in this case consists overwhelmingly of taxpayer's donations of cash and time to the Library.[17] In the depart-

---

[16] However, returning momentarily to the second requirement in the entity-level test, the court does find taxpayer's ability to attract and retain volunteers, as well as donations of books, to be substantial additional evidence that taxpayer is performing in a manner that supports its charitable purpose. Taxpayer's volunteers logged 6,707 hours of volunteer time during 2015 and more than 3,500 hours during the first half of 2016. Taxpayer reported the number of volunteers at nearly 50 in mid-2016. Taxpayer's newsletter regularly solicited volunteers and made clear that their service would benefit the Library. Taxpayer describes its volunteer program as a "joint effort" with the Library, noting that taxpayer and the Library use the same volunteer coordinator.

[17] Taxpayer also at times refers to its activities to promote the Library and other activities it regards as charitable. The court finds it noteworthy

ment's view, these gifts are inadequate because taxpayer is not giving the cash directly to poor customers in the form of discounts or free books. The department's argument is consistent with its position, discussed below, that a retail store selling at market prices cannot be exempt unless the retail store engages in charitable giving through the act of selling, for example by intentionally training or providing long-term employment to persons who otherwise would have barriers to employment.[18] Although taxpayer's donations to the Library differ from the direct customer discounts for the poor discussed in *SW Oregon*, *YMCA II*, and *Hazelden/Serenity Lane*, the court concludes that taxpayer's donations to the Library suffice in this case because they fulfill the underlying purpose of the "gift or giving" requirement by providing the poor with access to books. The city-owned Library already provides books (and many other materials and services) to the community at no charge. Taxpayer, located across the street from the Library, need not replicate that activity in order to demonstrate an element of "gift

---

that taxpayer organized a public reading and book signing with Bill Hall, the author of a book about former Oregon Governor Tom McCall at the Library on October 25, 2015. Paula Gunning, McCallandia Author to Speak at "Friends" Annual Meeting, The Book-Mark at 1-2 (Sept/Oct 2015) (newsletter). The event was "free and open to the public *** with complimentary refreshments." *Id*. The court sees the author event as an indicator that supporting the Library remained taxpayer's primary focus.

    In addition, taxpayer presented evidence of numerous sales and promotions, some of which seem linked by theme or timing to coincide with Library programming. For example, taxpayer held a "Star Wars sale Dec 1-14" that appears to have coincided with an "Open House/Tree Lighting" ceremony. *See* Jessica Miele, *Yoga Storytime: Stretching Kids' Bodies and Imaginations*, The Book-Mark at 2-3 (May/June 2016) (newsletter explaining Star Wars-themed yoga storytelling event held at the Library). In summer 2015, taxpayer offered a 50-cent bookstore coupon to participants in the Library's summer reading program. Taxpayer provided lawn space for one of four stages for an event called "Ten Tiny Dances," the other stages having been set up in the same park across the street that houses the Library. In 2015 and 2016, taxpayer offered discounted theater tickets to productions at the Beaverton Civic Theater for customers who donated books to taxpayer. The court finds that these activities generally do "double duty," in the sense that they seem designed to promote taxpayer's sales as much as to promote the Library. The court assigns little weight to these activities, whether as an indicator of "gift or giving" or as an overall indicator of actions furthering taxpayer's charitable object.

    [18]  The Oregon Supreme Court has explained that when determining whether an element of "gift or giving" is present, the "appropriate perspective *** is that of the recipient of the charitable giving." *Dove Lewis*, 312 Or at 91 (citing *former* OAR 150-307.130(A)(3)(d)).

or giving"; it is sufficient that taxpayer devotes most of its net profit, as well as the time of numerous volunteers, to the Library so that the Library itself is better able to make books available to everyone, including the poor.[19] In a real sense, taxpayer sells books as a continual fundraiser in order to help the Library make books available for free. The court concludes that taxpayer fully satisfies the entity-level requirements and qualifies as a charitable institution.

D.  *Is the subject property actually and exclusively used to accomplish taxpayer's charitable purpose?*

The property use test differs from the entity-level test in that the property use test reflects the *in rem* nature of property taxation. To administer the property tax, each county assessor must determine whether to classify each parcel of real property, and each item of personal property, as either taxable or exempt in the course of the annual assessment process. *See Gray v. Dept. of Rev.*, 23 OTR 220, 223-24 (2018). Whereas the entity-level test asks whether the property's owner or lessee generally is acting for the benefit of the public or those in need, as opposed to in self-interest, the property use test asks how closely a particular parcel or item of property is connected to the owner's or lessee's charitable purpose. *See Benevolent Society v. Kelly*, 28 Or 173, 190, 193-97, 42 P 3 (1895) (interpreting prior law requiring that property be "actually occupied" for literary, benevolent, charitable, or scientific purposes); *Mult. School of Bible*, 218 Or at 31, 36-37 (interpreting current law requiring that property be "actually and exclusively occupied or used" for such purposes; holding the property must be "reasonably necessary" to accomplishment of organization's prime purposes).[20]

---

[19] Without minimizing the barriers that even small dollar amounts can create for the indigent, the court also observes that books and DVDs are in a price class very different from hospital services, addiction treatment, and health club memberships.

[20] In *YMCA v. Dept. of Rev.*, 268 Or 633, 635 n 1, 522 P2d 464 (1974) (*YMCA I*), the court referred to a use of property that "substantially contributes" to furtherance of the overall goals of the charitable organization, apparently paraphrasing the "reasonably necessary" test articulated in *Mult. School of Bible*. In *Habitat for Humanity v. Dept. of Rev.*, 360 Or 257, 264-66, 381 P3d 809 (2016), the court again applied the "reasonably necessary" test.

    As an important limitation within the property use test, longstanding Oregon precedent declares that if the primary use of the subject property is to make money to fund charitable operations occurring on other properties, the connection to the organization's charitable purpose is too attenuated to support exemption of the subject property. The Oregon Supreme Court first considered—and rejected—the so-called "destination of income" theory of charitable exemption in 1895. *Benevolent Society*, 28 Or at 189. In that case, the taxpayer owned a three-story building in Portland, of which the ground floor was rented for stores, the second story rented for offices (except one room that the taxpayer occupied), and the third story rented for a public hall. *Id.* The taxpayer was a benevolent society that provided a disability benefit to certain Irish persons and persons of Irish descent. The county argued both that the taxpayer was not a charitable institution (because of the limitations on persons who could participate) and that the taxpayer did not use the property for charitable purposes. The court concluded that taxpayer could theoretically be a charitable institution under the Oregon statute even though its benefits were not available on a "universal" basis.[21] But, regardless of that possibility, the court held that the property was not exempt from tax because it was "used for other and different purposes" that were "in competition with the property of other owners." *Id.* at 193. The court stated:

> "It is the actual occupancy of the property which determines its right to exemption, and not the use made of its proceeds. The plain and obvious meaning of the statute is that only the real estate actually occupied and in use by these different institutions for the purposes for which they were organized shall be exempt from taxation. *While so occupied and used, it does not come in competition with the property of other owners*, and the purpose for which it is used was supposed by the legislature to be a sufficient benefit to the public to justify its exemption from the burdens of taxation imposed upon other property.

---

[21] Because the taxpayer did not meet the use requirement, the court never reached a conclusion as to whether the taxpayer was in fact a charitable institution. *Id.* at 193.

> But when such property is used for the purpose of accu-
> mulating money, the law imposes upon it the same bur-
> den of taxation as it imposes upon other property similarly
> situated."

*Id.* at 193-94 (emphases added); *see also Willamette University v. Knight*, 35 Or 33, 46, 56 P 124 (1899) (real property leased to nursery company held not exempt because it was used for a purpose other than the university's charitable purpose and generated profit "in direct competition with business of like nature and kind carried on elsewhere by other persons").

A court today faced with the facts of *Benevolent Society* could readily deny exemption on the simple ground that the charitable owner had rented out the property, which destroys exemption unless the lessee applies for and receives a determination of exemption in its own right. *See* ORS 307.166 (requiring lessee to apply for exemption); Or Laws 1973, ch 476 (first enacting predecessor, *former* ORS 307.164). But the Supreme Court has applied the reasoning of *Benevolent Society* even to property used for retail purposes by the *same* entity that operates as an undisputed charity in other locations. *Mult. School of Bible*, 218 Or at 24-26, 37. In that case, the taxpayer operated a religious college on a campus in the eastern part of Portland, but it also owned the subject property, a retail book and religious "Christian Supply Center" several miles away, downtown. *Id.* at 38. The taxpayer argued that "all profits from the Christian Supply Center are immediately channeled back into the treasury of the school, where it is employed for the purposes for which the school was organized." *Id.* at 39. The court saw no reason to question that assertion but denied the exemption, citing *Benevolent Society*:

> "We hold plaintiff's business, known as the Christian
> Supply Center, is an enterprise for the purpose of business
> and profit which comes in direct competition with busi-
> nesses of like nature and kind carried on elsewhere by other
> persons and does not comply with ORS 307.130, supra, so
> as to entitle it to the tax relief sought, even though its net
> gains flow to and are devoted by the Bible School to religion
> or education."

*Id.* at 42. The Supreme Court's rejection of the destination-of-income theory of exemption is thus firmly embedded in today's law.[22]

The Supreme Court's most recent opinion involving the charitable exemption does not change the analysis. In *Habitat for Humanity*, 360 Or at 264, the court held that a vacant lot that the taxpayer ("Habitat") held for later improvement and eventual sale satisfied the property use requirement. The issue was whether the requisite "use" was occurring even though Habitat was not actively constructing housing on the lot on the assessment date. Because Habitat's charitable purpose necessarily involved holding and improving real property, in contrast to taxpayers such as the hospital and university involved in prior leading cases,[23] the court held that Habitat's mere holding of the lot satisfied the use requirement. Importantly for this case, however, the court never had to consider its prior rejection of the destination-of-income theory of exemption because the parties had stipulated that Habitat acquired the lot "for 'the sole purpose of later building a residential home on it using volunteer labor and selling it *to a low-income family at a price below market*.'" *Id.* at 259 (emphasis added). For Habitat, use of the property consisted, ultimately, of transferring it to the poor at a below-market discount—the lot was, in a general sense, part of Habitat's inventory held for sale. By contrast, taxpayer asks the court to assume that it does *not* sell below market—to anyone, rich or poor. Selling books to the poor at a discount below market value is not part of taxpayer's charitable mission; rather, taxpayer's mission is to send money from book sales to the Library,

---

[22] Prior decisions of this court and the Oregon Supreme Court have all analyzed the "destination of income" issue under the "property use" requirement of the two-part analysis. *See Benevolent Society*, 28 Or at 193-97; *Willamette Univ.*, 35 Or at 44-46; *Corp. Presiding Bishop v. Dept. of Rev.*, 6 OTR 268, 269 (1975), *aff'd*, 276 Or 775, 556 P2d 685 (1976) (religious organization was not entitled to exemption with respect to its farm property from which profits were derived despite contention that the rental income was used for the care of the poor and needy); *see also Kiwanis Club v. Dept. of Rev.*, 12 OTR 318, 320 (1992) (rejecting destination of income as grounds to exempt a retail store stocked with donated goods); *YMCA II*, 308 Or at 655 (rejecting use of income to support charitable affiliate as basis to exempt fitness centers that generated the income).

[23] *See Eman. Luth. Char. Bd. v. Dept. of Rev.*, 263 Or 287, 502 P2d 251 (1972); *Willamette Univ. v. Tax Com.*, 245 Or 342, 344-45, 422 P2d 260 (1966).

which does make books available to rich and poor alike. Praiseworthy though taxpayer's use of its property is, it is exactly analogous to the use that the court found ineligible in *Mult. School of Bible*.[24]

Thus the same facts that support the court's favorable determination of taxpayer's status as a charitable institution work against a favorable determination under the property use test. Taxpayer's overall mission is to support the Library. Its declared strategy for doing so is "by acquiring and selling books" and other materials. Taxpayer's primary use of the subject property implements exactly that strategy. Taxpayer uses the property primarily to run an impressive operation of employee-led volunteers who receive donated books, sort them, and sell them at market prices. However, *Mult. School of Bible* precludes exemption for this use.

Taxpayer asserted at oral argument that *Mult. School of Bible* is distinguishable because taxpayer sells exclusively books that are donated, by either the Library or the public, and because taxpayer relies heavily on numerous volunteers in addition to its two part-time paid employees. But neither the statute nor the case law supports an exception to *Mult. School of Bible* based on those facts. An organization's ability to attract donations of goods and volunteer labor is a factor that repeatedly has moved the legislature to amend ORS 307.130 to extend exemption to retail operations that support charitable activity in other places, but only in combination with other factors not present here. A "retail store dealing exclusively in donated inventory" may be exempt under ORS 307.130(2)(d), but that provision also requires that the proceeds be used to support a "welfare program," defined as the "providing of food, shelter, clothing or health care *** to needy persons without charge." *See Kiwanis Club v. Dept. of Rev.*, 12 OTR 318, 320 (1992) (finding

---

[24] *Habitat for Humanity* also is distinguishable because in taxpayer's case the property at issue is not taxpayer's inventory being held for sale (which consists of books that, as personal property, already would enjoy exemption under ORS 307.400), but rather the facility at which taxpayer performs its activities. The inventory exemption was not available for the taxpayer's personal property in *Mult. School of Bible* because the legislature did not enact the inventory exemption until 1969. Or Laws 1969, ch 612, § 1 (HB 1214).

taxpayer's activities were not limited to a "welfare program," with the consequence that taxpayer's retail store was not entitled to exemption under *former* ORS 307.130(1)(d)). Providing books or literature is outside the scope of a "welfare program." A "retail store deal[ing] primarily and on a regular basis in donated and consigned inventory" may be exempt under ORS 307.130(2)(e), but only if "all individuals" who operate the store are volunteers. Taxpayer is ineligible because it has two paid employees. A "retail store deal[ing] exclusively in donated inventory" may be exempt under ORS 307.130(2)(h), but only if its proceeds are used to support a specific type of "not-for-profit housing program."[25] The court in *Mult. School of Bible* articulated two reasons to deny exemption: the moneymaking use of the retail store is different from the use for which exemption is allowed at the college's other location, and the use of the property of the retail store competes with other businesses. 218 Or at 36-37, 42. *See also Benevolent Society*, 28 Or at 193-97; *Willamette Univ.*, 35 Or at 44-46; *Corp. Presiding Bishop v. Dept. of Rev.*, 6 OTR 268, 269 (1975), *aff'd*, 276 Or 775, 556 P2d 685 (1976). Both of those reasons apply here as well. Taxpayer's use of the subject property does not make books available to the poor, for free or at below-market prices, *at the subject property*; meanwhile, taxpayer's use of the subject property for on-site and online sales competes with other retail booksellers. The generosity of the donating public and numerous volunteers enables taxpayer to raise substantial funds for the Library even while keeping prices low, but the use of donated inventory and volunteer time does not overcome the restriction on exemption imposed by the Oregon courts' rejection of the destination-of-income theory under the property use requirement.

Taxpayer advances other uses it makes of the subject property, but none of them rise to the level of the "primary" use. Taxpayer does use the property to receive, identify, and package or otherwise prepare some books for donation to other charitable institutions. But even applying the available numbers from 2015 before taxpayer ceased donations to its largest charitable donee (the Salvation Army), taxpayer's

---

[25] Other provisions exempt a "retail outlet" of a "rehabilitation facility," as defined (ORS 307.130(2)(c)), or a "retail store" of a "history museum or science museum." ORS 307.130(3).

donations to other charitable institutions amounted to 1,017 boxes and bags of books out of more than 4,000 boxes and bags received.[26, 27] This implies that taxpayer gave to charity about 23 percent of the books it received; sold about 6 percent at wholesale; and sold the remaining approximately 71 percent at retail. The court thus finds that processing books for donation to other charitable institutions was not the primary use of taxpayer's property. Similarly, taxpayer uses the property to temporarily house books that the Library needs to dispose of in order to make room for newer materials. This use of the property may relieve a burden of government, as the Library is a municipal institution. But books from the Library amount to only 25 percent of taxpayer's inventory; the rest come from the general public. At that level, disposing of older Library books cannot be the primary use of the property even if the court ignores the fact that intake, sorting, and storage activities also make it possible for taxpayer to *sell* the overwhelming majority of these books.

The court does not question the charitable motivation of taxpayer's board, officers or other volunteers, but it is clear to the court that Oregon precedent does not allow the court to treat the subject property as "actually and exclusively occupied or used" in taxpayer's charitable work as ORS 307.130(2)(a) requires.

E.   *Is taxpayer a literary institution?*

Taxpayer makes the alternative argument that the subject property is exempt from taxation because taxpayer qualifies as a "literary institution" and actually and exclusively uses the subject property for its literary work pursuant to ORS 307.130(2)(a). Taxpayer argues in its motion that its "whole purpose and all of its activities are directed to the 'propagation and spread' of literature." (Quoting OAR

---

[26] Exhibit A to Bartos's declaration contains an apparent typographical or arithmetic error indicating that taxpayer donated only 1,204 boxes during 2015. Of the correct total donated, 270 went to Better World Books, a for-profit entity as previously noted. 1,287 (total) – 270 (Better World) = 1,017.

[27] The average total of boxes and bags per month, based on the most complete monthly summaries (for January through March and September through December 2015) is 374, from which the court extrapolates an estimated number of 4,483 for the calendar year 2015.

150-307-0130(1).) In addition to accepting books from the Library, taxpayer identifies several activities at the subject property that it asserts contribute to the spread of literature, such as book fairs, community book sales, reading events, author talks and festivals. The department, while acknowledging that taxpayer's donations of money to the Library and its donations of some portion of its inventory may help "propagate and spread" the study of books, argues that the court need not focus on the distinct meaning of "literary institution" because a correct reading of the relevant Oregon Supreme Court precedent requires even an entity seeking exemption as a literary institution to have charity as its primary object, which the department claims taxpayer does not.[28] The court does not decide whether the department's reading is accurate because the court already has concluded that taxpayer has charity as its primary object, in the foregoing analysis of the entity-level requirements for a charitable institution. The court therefore turns to analysis of taxpayer's argument, focusing on the term "literary institution."

Compared to the term "charitable institution," Oregon Supreme Court decisions provide relatively little guidance on the meaning of "literary institution." Accordingly, the court approaches taxpayer's alternative claim as a question of statutory interpretation requiring the court to examine the statute's text, context and (to the extent available and helpful) legislative history, as well as general rules of construction to resolve any remaining uncertainty. *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009). In doing so, the court applies Oregon Supreme Court decisions wherever applicable. As noted most recently by the Oregon Supreme Court in *Theatre West of Lincoln City, Ltd. v. Dept. of Rev.*, 319 Or 144, 873 P2d 1083 (1994),

---

[28] The department argues that this court's opinions holding that a literary or scientific institution need not have charity as its primary purpose misinterpret the Oregon Supreme Court's holding in *Theatre West of Lincoln City, Ltd. v. Dept. of Rev.*, 319 Or 144, 117, 873 P2d 1083 (1994), and conflict with *Behnke-Walker*, 173 Or at 520 (citing *Math Learning Center v. Dept. of Rev.*, 14 OTR 62, 65-66 (1996), and *Oregon Writer's Colony v. Dept. of Rev.*, 14 OTR 69, 73 (1996)). Because the court has already concluded above that taxpayer satisfies the higher standard for a charitable institution under the three-part test in *SW Oregon*, the court need not revisit the standards expressed in *Math Learning Center* and *Oregon Writer's Colony*.

the key statutory language exempting property of all "literary, benevolent, charitable and scientific institutions" has remained unchanged since the territorial legislature originally enacted it in 1854. *See Theatre West*, 319 Or at 119.[29] As to the text, the term "literary institution," like the more common term "charitable institution," is recognized as a standalone term but is not defined in statute. *See id.* at 118. In discerning the plain meaning of multiword terms, the Oregon Supreme Court recently has taken the systematic approach of looking first for a definition of the phrase as a whole. *See, e.g.*, *Comcast v. Dept. of Rev.*, 356 Or 282, 297-98, 337 P3d 768 (2014) (determining at the outset of its analysis that phrase "data transmission services" has no familiar or common meaning; rejecting as "futile" an approach that would require the court to "cobble together definitions of the individual words to make collective sense of the phrase as a whole"); *Tharp v. PSRB*, 338 Or 413, 423, 110 P3d 103 (2005) (analyzing meanings of "mental disease or defect" and "personality disorder" as complete phrases "although they consist of common individual words").

As with any term, Oregon courts often consult dictionary definitions of multiword phrases, on the assumption that, if the legislature did not give the term a specialized definition, the dictionary definition in use at the time best

---

[29] The phrase "literary, benevolent, charitable and scientific institutions" first appeared in an act of the territorial legislature dated January 27, 1854, in a provision materially identical to the relevant portion of today's ORS 307.130(2):

"The following property shall be exempt from taxation:

"* * * * *

"(4)  The personal property of all literary, benevolent, charitable and scientific institutions incorporated within this territory, and such real estate belonging to such institutions as shall be actually occupied for the purposes for which they were incorporated."

The Statutes of Oregon, Enacted and Continued in Force by the Legislative Assembly at the Session Commencing 5th December, 1853, ch I, tit I, § 4 (Bush 1854); compiled in General Laws of Oregon, Civ Code, ch LIII, title I, § 4, p 894 (Deady 1845-1864) ("Section Four"), also codified at Codes and General Laws of Oregon, ch XVII, title I, § 2732 (Hill 1887), *available at* https://heinonline.org/HOL/P?h=hein.sstatutes/coglwor0002&i=226; The Codes and Statutes of Oregon, title XXX, ch I, § 3039 (Bellinger & Cotton 1901), *available at* https://heinonline.org/HOL/P?h=hein.sstatutes/codsor0002&i=250 (emphasis added). *See Behnke-Walker*, 173 Or at 513 ("Ever since its enactment by the territorial legislature in 1854 * * * [the statute] has remained unamended, except that the word "territory" therein has been changed to "state." (Citation omitted.)).

reflects the meaning that the legislature would naturally have intended. *Comcast*, 356 Or at 296. The court has found no dictionary definition of "literary institution" contemporaneous with 1854, although a contemporaneous dictionary does *use* the phrase as follows:

> "Institution—A system, plan or society established, either by law or by the authority of individuals for promoting any object, public or social. *We call a college or an academy, a literary institution*; a bible society, a benevolent or charitable institution; a banking company and an insurance company are commercial institutions."

Noah Webster, 1 *An American Dictionary of the English Language* 114 (1828) (emphasis added). The same dictionary defines "collegian" as a "member of a college, particularly of a *literary institution* so called; an inhabitant of a college." *Id*. at 41 (emphasis added).[30] In contrast to a *definition* of the phrase as a whole, the *use* of the phrase leaves open the possibility that a "college or an academy" was only one type of "literary institution."

The court turns to the statutory context. To start with, the court has searched for other contemporaneous uses of the phrase "literary institution" in Oregon statutes, but the court has found nothing useful there.[31] The court notes that the 1957 Legislative Assembly created a specific exemption for certain educational institutions or organizations:

> "If not otherwise exempt by law, the schools, academies and student housing accommodations, owned by incorporated eleemosynary institutions or by incorporated

---

[30] "College" being defined, in pertinent part, as "the society of persons engaged in the pursuits of literature, including the officers and students." *Id*.

[31] In 1849, the territorial legislature passed a law exempting "the property of all literary institutions, together with public buildings, and other property belonging to the Territory[.]" *See* An Act, to provide for assessing and collecting County and Territorial Revenue (Sept 29, 1849). Two years later, the legislature deleted the phrase "literary institution" from the act. *See* An Act, amendatory to an act *** passed September 29, 1849 (Feb 7, 1851). Nothing in either act defines "literary institution," and the court has found no cases interpreting the 1849 or 1851 acts. Aside from the limited (and for this purpose uninformative) legislative record preserved in the journals of the territorial legislature, the court is unaware of any legislative history of the acts of 1854, 1851, or 1849 to assist in the interpretation of "literary institution."

religious organizations, used exclusively by such institutions or organizations for or in immediate connection with educational purposes, are exempt from taxation."

ORS 307.145. The existence of ORS 307.145 implies that the legislature in 1957 at least questioned whether the existing phrase "literary, benevolent, charitable and scientific institutions" already exempted the property described in ORS 307.145. Any such perception of ambiguity in 1957 is, of course, not relevant to the instant case, as it does not reveal the intention of the territorial legislature more than 100 years earlier. *DeFazio v. WPPSS*, 296 Or 550, 561, 679 P2d 1316 (1984) ("The views legislators have of existing law may shed light on a new enactment, but it is of no weight in interpreting a law enacted by their predecessors.").[32] In any event, there is evidence that the 1957 Legislative Assembly had no intention of changing the application of prior exemption provisions: the text of ORS 307.145 expressly exempts property "[i]f not otherwise exempt by law," and one of the senators is recorded as having remarked during a committee meeting that the bill "was put in to clarify and not to disturb the existing law." Minutes, Senate Committee on Taxation,

---

[32] In addition, a close reading of the text of ORS 307.145 suggests that the legislature in 1957 was concerned largely with specific types of property, the status of which may have been unclear under the general exemption for "literary institution" property. First, the reference to "schools" may have been an effort to clarify that exemption applied to property used for education below the college level. The reference to "student housing accommodations" seems to clarify, or possibly extend, the scope of the exemption. By including property used by "religious organizations" for educational purposes, ORS 307.145 eliminates doubt as to whether those schools were eligible. And the phrase "for or in immediate connection" with educational purposes suggests that exemption might apply to a somewhat broader range of properties than even student dormitories. The legislative history supports these inferences. The minutes of the Senate Taxation Committee initially suggest that the purpose of the bill was to ensure exemption for four educational institutions in Portland notwithstanding the fact that nuns and priests who worked there also used portions of the premises as living quarters. Minutes, Senate Committee on Taxation, Mar 28, 1957, 1-2; *see also id.*, Apr 18, 1957, 3. (It is unclear from the surviving committee minutes whether the proponents were concerned about loss of exemption for all of the property at each facility or only about loss of exemption for the living spaces.) Counsel for the State Tax Commission, Ted de Looze, testified to the effect that "there was not a specific statute exempting property of educational institutions. They obtain because they come within [ORS] 307.130 because they are literary, scientific, educational, etc." Minutes, Senate Committee on Taxation, Mar 29, 1957, 5. de Looze went on to mention married student housing and dormitories as among issues that the bill should address specifically. *Id.*, Mar 29, 1957, 6.

Apr 18, 1957, 3 (statement of Sen Ohmart). In short, nothing in ORS 307.145 suggests that the existing exemption for property of "literary institutions," now codified in ORS 307.130, applies to property of a bookstore.

The court next considers the relatively few Oregon judicial opinions that have interpreted the phrase "literary institution." The first was a nontax case involving Corvallis College, which some years previously had been designated a federal land grant college but still was associated with its founding body, the Methodist Episcopal Church. *Liggett v. Ladd*, 23 Or 26, 31 P 81 (1892). The trustees decided to deed a previously purchased "agricultural farm" to the state after it became clear that the college could not raise the funds from the church or the local community to maintain the federally mandated curriculum of "agricultural studies, military tactics, * * * and the mechanic arts" while also adhering to the requirement in the college's articles of incorporation to "maintain a strictly literary institution for educational purposes." *Id*. at 39-46. The point significant for this case is that the Supreme Court seemed to agree that the trustees reasonably were concerned that running an agricultural college would violate the corporate mandate to run a "strictly literary institution." *See id*. at 44-45. This court infers that, as of 1892, the phrase "literary institution" encompassed a college or school, and that a "strictly" literary institution meant one devoted to courses of study other than practical pursuits such as agriculture. Arguably, those meanings relate back to 1868, when the founders drafted the articles of incorporation.[33]

---

[33] Later Oregon cases that incidentally mention the phrase give no indication that the Supreme Court ever sought to broaden the definition of "literary institution" beyond its original meaning as a type of school. *See Barmore v. Board Medical Examiners*, 21 Or 301, 307, 28 P 8 (1891) (quoting *Ill. State Bd. of Dental Examiners v. People*, 123 Ill. 227, 242, 13 NE Rep 201 (1887) (citing an Illinois regulation requiring preliminary examination if "no certificate from a high or normal school, or other literary institution, is presented by the candidate")); *Philomath College v. Wyatt*, 27 Or 390, 396, 31 P 206 (1892), *aff'd*, 27 Or 390, 37 P 1022 (1894) (stating that Philomath College was organized as a "literary institution"); *University v. Multnomah Co.*, 31 Or 498, 499, 50 P 532 (1897) (deciding procedural issues; acknowledging that certain property of Portland University was exempt as property of a "literary institution"); *Security Sav. & Trust Co. v. Lane County*, 152 Or 108, 135, 53 P2d 33 (1935) (citing *Williston Seminary v. County Commissioners*, 147 Mass 427, 430, 18 NE 210 (1888) (implying that a seminary is a literary institution)).

In *Willamette University v. Knight*, decided in 1899, the court's holding was to deny exemption for a portion of improved land that the university leased to others for profit, as noted above. *See* 35 Or at 44-46. The court freely described Willamette University as a "literary institution" but saw no need to define the term. The next case, *Kappa Gamma Rho v. Marion County*, 130 Or 165, 279 P 555 (1929), involved property owned by an incorporated fraternity and operated as a residence hall for members attending Willamette University. The court concluded that the corporation was neither a charitable, literary, nor scientific institution. It was not charitable because it was "organized and maintained for the convenience of its members." 130 Or at 176. In rejecting the taxpayer's argument that it qualified for the exemption for literary or scientific institutions, the court stated:

> "The literary work is that of a student while attending college. The scientific phase of plaintiff's activities is that of a student while preparing himself for his life's vocation. Such pursuits are not generally classed as literary or scientific. *** Literary societies are organizations for the propagation and spread of good literature rather than for one's own individual education. Scientific societies are usually and ordinarily understood to embrace organizations for the promotion of science or the pursuit of scientific studies for the purpose of developing science, rather than as a student in a college or university for his own edification."

*Id.*[34] The court did not question the taxpayer's assertion that Willamette University itself was a "literary, benevolent, charitable and scientific institution ***." *Id.* at 167.

---

[34] The phrase "literary societies," appearing in *Kappa Gamma Rho*, may have had a meaning different from, and broader than, "literary institution." In 1851 the territorial legislature passed a law providing for the regulation of "all associations for literary or religious purposes, except common schools, colleges and university." An Act to regulate incorporated Literary and Religious Societies," compiled in Statutes of General Nature Passed by the Legislative Assembly of the Territory of Oregon, 2nd Regular Session (Bush 1851). That 1851 act was superseded in 1864 by "[a]n Act providing for the incorporation of churches and religious, benevolent, *literary* and charitable societies" (the "1864 Act") (emphasis added). *See* General Laws of Oregon, Civ Code, ch IV, title IV, § 1, 632-33 (Deady 1845-1864) (codifying 1864 Act); *Benevolent Society*, 28 Or at 174 (explaining that taxpayer's organization was incorporated under the 1864 Act). In 1937 the legislature eliminated the words "literary" and "societies" from the statute, Or Laws 1937, ch 246, § 25-901, and in 1941 the legislature repealed the 1864 Act in whole and replaced it with a law providing for the incorporation of nonprofit corporations generally. Or Laws 1941, ch 462, § 1 (repealing 1864 Act; enacting

In *Behnke-Walker v. Multnomah County*, 173 Or 510, 146 P2d 614 (1944), the taxpayer was a business college that taught "bookkeeping, shorthand, English, arithmetic, business administration and kindred subjects." 173 Or at 511 (internal quotation marks omitted). The taxpayer was organized as a regular business corporation and not under the nonprofit corporation statute. *Id.* at 512. These facts alone distinguish the instant case, but this court sets forth the majority and concurring reasoning in order to better explain this court's decision. The majority in *Behnke-Walker* concluded that the taxpayer's property was not exempt, stating:

> "Upon viewing [the original 1854 exemption statute, including the provisions exempting government-owned property,] in its entirety, it is apparent that the legislature did not intend to exempt from taxation private property used for private profit, and that the only property, public or private, in fact exempted is such as 'has been sequestered or devoted to public uses' ***."

---

an act "[r]elating to the organization and operation of nonprofit corporations"); *see Benhke-Walker*, 173 Or at 515 (discussing the history of the 1864 Act and the amendatory legislation leading up to its repeal in 1941).

In addition to the cases discussed elsewhere in this opinion, the court is aware of two other cases that made express reference to the phrase "literary societies," both in the context of the 1864 Act: *Philomath College v. Hartless*, 6 Or 158, 165 (1876) (stating that plaintiff, a college, would be legally incorporated as a "literary society" under the 1864 Act), and *Landgraver v. Emanuel Lutheran*, 203 Or 489, 533-34, 280 P2d 301 (1955) (Brand, J., dissenting), *overruled in part by Hungerford v. Portland Sanitarium*, 235 Or 412, 384 P2d 1009 (1963) (discussing the 1864 Act incorporating "literary and charitable societies" (citing the Supreme Court's rejection of the destination-of-income theory in *Benevolent Society* to justify stripping nonprofit corporations of immunity for torts committed while the corporation is engaged in noncharitable activities)). A third case, *Burkitt, et al. v. School Dist. No. 1, et al.*, 195 Or 471, 246 P2d 566 (1952), quoted a California appellate court's use of the phrase "literary society" to describe a society that became part of a fraternity. 195 Or at 480 (quoting *Bradford v. Board of Education*, 18 Cal App 19, 23, 121 P 929 (1912) ("The first Greek letter society in a secondary school was Alpha Phi, a literary society, which became a part of a fraternity in 1876.")). Although the court has found no contemporaneous definition of "literary society," the 1828 edition of *Webster's* dictionary defined the word "society" to include "[a]ny number of persons associated for a particular purpose, whether incorporated by law, or only united by articles of agreement; a fraternity *** we have bible societies for various objects *** societies for mechanics, and learned societies; societies for encouraging arts, &c." *Webster's American Dictionary of the English Language* (unpaginated 1828). The same dictionary entry notes that "Literary society renders a place interesting and agreeable." *Id.* The court interprets the foregoing authorities as strongly suggesting the phrase "literary society" was less well defined than the phrase "literary institution" and may have encompassed a broader range of groups that, unlike literary institutions, did not necessarily maintain an educational curriculum or confer degrees.

*Id.* at 520. After reviewing cases from other states on the subject of exemption for property held by for-profit entities, the majority concluded:

> "We have not discussed or considered whether the plaintiff's business college would fall within the definition of a 'scientific' or 'literary' institution, if owned and used as a business college by a non-profit corporation, inasmuch as it is our conclusion that the plaintiff's property is used for private gain and is therefore taxable."

*Id.* at 526. The concurring opinion agreed with the result, but on the separate ground that a business college inherently does not qualify as a "literary institution" because of the nature of the curriculum, a ground not discussed in the majority opinion. *Id.* at 527 (Kelly, J., specially concurring). The concurrence strongly disagreed with the holding that incorporation under the nonprofit corporation act is a prerequisite to exemption. In doing so, the concurrence characterized the majority opinion as follows:

> "As I understand the majority in the case at bar, the holding is that in order to be exempt from taxation the institution not only must be scientific or literary but benevolent and charitable also. Not only that, it must be incorporated under the nonprofit corporation statute."

*Id.* at 529 (Kelly, J., specially concurring).

The next and most recent Oregon Supreme Court opinion to construe the phrase "literary institution" for property tax purposes—and the only one to grant the exemption—was *Theatre West* in 1994. There, the Supreme Court allowed exemption for a nonprofit live theater production company. The Supreme Court rejected this court's narrow interpretation of the term "literary," which would have limited the exemption to organizations involved with "literature or written words" but not "movies, theatre, television or opera." 12 OTR at 483. The Supreme Court found evidence of a broader meaning of the terms "literary" and "literature" in current dictionary definitions and in sources contemporaneous with or predating the 1854 territorial legislature. 319 Or at 118-19. Those definitions led the Supreme Court to conclude that scripts of plays are literature, and to hold that "an organization that is devoted to the production of

plays that expose actors and audiences to those scripts is a 'literary institution.'" *Id.* In so holding, the court added the partial quotation from *Kappa Gamma Rho* that "'[l]iterary societies are organizations for the propagation and spread of good literature \* \* \*.'" *Id.* at 119 (quoting *Kappa Gamma Rho*, 130 Or at 176).

None of the Oregon Supreme Court's opinions regarding the definition of "literary institution" has involved a bookstore. Nor have those prior cases required the court to articulate a general principle that squarely resolves this case. This court interprets the Supreme Court's broad reference to "organizations for the propagation and spread of good literature" not as a comprehensive definition but as a statement of one element in determining whether an organization qualifies as a literary institution, and as a contrast not only to the self-serving purpose of the fraternity house in *Kappa Gamma Rho*, but also to this court's narrow interpretation in *Theatre West* that would have confined the exemption to organizations dealing with print materials.

As recounted in the Supreme Court's opinion, *Theatre West* involved actors and production crews engaged in interpretive performances that "expose[d]" actors to scripts and enabled audiences to "fully explore" the scripts as works of literature. 319 Or at 118-19. By contrast, taxpayer's role is more analogous to a nonprofit ticket service that sells tickets to plays, donating large portions of the proceeds to a charitable cause. Taxpayer succeeds in its primary purpose by generating a high volume of sales and by managing its expenses prudently, not by engaging with its volunteers or its customers about the literary qualities of particular works. Taxpayer is a step removed from the kind of activity that the Supreme Court considered "literary" in *Theatre West.*

Since *Theatre West*, the Regular Division has considered one case in which the taxpayer claimed exemption as a "literary institution." *Oregon Writer's Colony v. Dept. of Rev.*, 14 OTR 69 (1996). There, the court upheld exemption for an organization operating a beach house used as a center for writer workshops and as a space to which individual writers could retreat in order to work. The opinion in that case made clear that the purpose of the organization

was to "educate" writers and to support them "in producing literature." 14 OTR at 71, 73. The court found that the organization used the property for those purposes. *Id.* at 76. The opinion suggests that approximately one-fourth of the use was for workshops typically led by published writers, while the primary use was as a retreat location for individual writers. *Id.* at 70-71. The teaching activities in the workshops can be compared fairly to those of a college or school. The support to writers seeking a place to create in peace conceivably could be analogized to the efforts of a theater company that "exposes" actors to scripts and causes the actors to creatively interpret them for an audience. In any event, the court declines the department's invitation to revisit *Oregon Writer's Colony*, as the court is unable to see any factual analogy between the activities there and the retail book sales in the instant case; accordingly, *Oregon Writer's Colony* creates no "reasonable expectation" for taxpayer. *See Farmers Ins. Co. v. Mowry*, 350 Or 686, 698, 261 P3d 1 (2011).

The court continues its search for relevant context. Court opinions close in time to 1854 involving the laws of other states indicate that a college or other type of school was by far the most common meaning of the phrase "literary institution," although courts disagreed about the type or level of instruction that could qualify.[35] In *City of Indianapolis v. McClean*, 8 Ind 328, 332 (1856), the Indiana Supreme Court interpreted the phrase "literary institution" as part of a nearly identical string of institutions eligible for property tax exemption: "any literary, benevolent, charitable, or scientific institution * * *." *Id.* (quoting *Revised Statutes of the State of Indiana, Passed at the Thirty-Sixth Session of the General Assembly*, ch IV, § 5, at 106 (1852)). In denying exemption for a girls' boarding school, the court stated:

> "Is the school in question a literary institution? The word literary having no fixed legal signification, is to be taken in its ordinary and usual meaning. We speak of literary persons as learned, erudite; of literary property, as the

---

[35] *Cf. Behnke-Walker*, 173 Or at 527 (Kelly, J., specially concurring) (rejecting possibility that a "business" college could qualify as a literary institution).

productions of ripe scholars, or, at least, of professional writers; *of literary institutions, as those where the positive sciences are taught, or persons eminent for learning associate, for purposes connected with their professions.* This we think the popular meaning of the word; and that it would not be properly used as descriptive of a school for the instruction of youth."

*Id.* (emphasis added); *see Chegaray v. Jenkins*, 5 NY 376, 379 (1851) (referring to "a college, incorporated academy, or other seminary of learning" in property tax exemption statute as "literary institutions"); *Armstrong v. Athens County*, 10 Ohio 235, 238-39 (Dec 1, 1840), *aff'd sub nom*, *Armstrong v. Treasurer of Athens County*, 41 US 281, 16 Pet 281, 10 L Ed 965 (1842) (referring to "school-houses, academies, or colleges"; any "academy or seminary of learning" and "schools, academies, colleges" in property tax exemption statutes collectively as "literary institutions"); *cf.* NH Laws, ch 447 (1839) (preserving voting rights at place of permanent domicile "in all cases where individuals shall leave their home or place where they reside to attend an academy, college or *other literary institution* in any town or place in this state for the purposes of obtaining an education \*\*\*" (emphasis added)). Numerous contemporaneous opinions refer to various colleges and universities as "literary institutions." *E.g.*, *Trustees of Dartmouth College v. Woodward*, 17 US 518, 4 L Ed 629, 4 Wheat 518 (1819) (Marshall, C. J., repeatedly referring to Dartmouth College as a literary institution); *Board of Trustees of Vincennes University v. Indiana*, 55 US 268, 276, 14 How 268, 14 L Ed 416 (1852) (referring to Vincennes University as literary institution); *Washington University v. Rouse*, 75 US 439, 441, 19 L Ed 498, 8 Wall 439 (1869) (referring to Washington University as a literary institution); *Allen v. McKean*, 1 F Cas 489, 503-04 (D Me 1833) (referring to Bowdoin College as literary institution). There is evidence that the term also encompassed libraries. *E.g.*, *On the Law of Rating Literary Institutions*, 17 *Law Magazine: Or Quarterly Review of Jurisprudence* 180, 190-92 (1852) (summarizing and commenting on English cases exempting literary institutions from property tax ("ratings")); *see also Commercial Cities and Towns of the United States*, 16 *Hunt's Merchants' Magazine* 596, 598 (1847) ("The Young Men's Association [of Buffalo, New York,] is a flourishing literary institution, with

a library of over 3,000 volumes of well-selected books, and it sustains an able course of literary and scientific lectures in the winter season, which are numerously attended."). But the court has found no evidence that the term "literary institution" was used in reference to a bookstore of any kind.

The court concludes that the territorial legislature in 1854 would not have found taxpayer within the ordinary meaning of a "literary institution," as the ordinary meaning of the term at that time was limited to colleges and schools, and perhaps libraries. Subsequent Oregon decisions have not expanded the term to encompass taxpayer's activities. Because taxpayer does not fit within the term "literary institution," the court need not consider whether its use of the property is consistent with the purpose of such an institution.

## V.   CONCLUSION

The court denies taxpayer's motion for summary judgment because, although taxpayer is a charitable institution, taxpayer primarily uses the subject property as a retail store for the sale of used books. That use does not further taxpayer's charitable purpose except under a "destination of income" theory, which Oregon courts have squarely rejected. In addition, the court concludes that taxpayer is not a "literary institution" within the meaning of ORS 307.130(2)(a). Now, therefore,

IT IS ORDERED that Defendant's Motion for Summary Judgment is denied.